## THE WHITEASH and THE WINNIE.

### O'BRIEN v. THE WHITEASH and THE WINNIE.

(District Court, S. D. New York. November 26, 1894.)

COLLISION—OVERTAKING VESSEL — MUST CONFORM TO LEADING VESSEL —UN-
LICENSED DECKHAND IN CHARGE.

The tug Whiteash was rapidly overtaking the tug Winnie in going up the East River a little above the bridge, both having tows alongside. The Winnie changed her course to port, in order to pass to the left a large steamer coming down, under proper signals. The tow of the Whiteash, while the latter was overtaking and passing the Winnie to the left, came in collision with th latter's tow: *Held*, that it was not a fault in the Winnie to change her course to the left under appropriate signals, in order to meet and pass the steamer coming down, and that the Whiteash, being then behind and duly warned by the Winnie's signals of her intended movements, was bound to conform her own movements to those of the Winnie, and was therefore wholly in fault for the collision; that probably the collision would not have occurred had not the navigation been in charge of an unlicensed deckhand, while the master was at dinner.

This was a libel by Patrick O'Brien against the steam tugs Whiteash and Winnie for damages by collision.

Stewart & Macklin, for libelant.

Butler, Stillman & Hubbard and George Cromwell, for the Whiteash.

Robinson, Biddle & Ward, for the Winnie.

BROWN, District Judge. On the 15th of May, 1894, at about 11 o'clock in the forenoon, the libelant's canal boat J. C. De Freest, in tow of the tug Winnie, and on her port side, in going up the East river, when a little above the bridge, came in collision with a railroad float on the starboard side of the steamtug Whiteash, which was also bound up the East river. The De Freest sustained some damages, to recover which the above libel was filed against the Whiteash. The Winnie was brought in as a party defendant on the petition of the owners of the Whiteash, under the fifty-ninth rule of the supreme court in admiralty.

The evidence leaves no doubt that the Whiteash was the overtaking tug, and that she was going up the East river from two to three times as fast as the Winnie with her tow. There is considerable difference in the testimony in regard to the position of the Winnie, whether nearly in mid river, or considerably on the Brooklyn side; and also as to the distance between the lines of their two courses a few minutes before collision. The large steamer Whitney was coming down the East river, and after rounding Corlear's Hook and getting straightened down river, she was nearly ahead of the Winnie, and was at first intending, as her master states, to come down between the Winnie and the Whiteash. This indicates considerable breadth of water between their courses. The Winnie, however, when some distance below the Whitney, gave her a signal

of two whistles twice, to the last of which the Whitney replied with two, slowed down, starboarded and went to the left, while the Winnie by starboarding her wheel also turned to her left, so as to head somewhat across the river and approach the line of the Whiteash's course. The owners of the Whiteash contend that the collision was brought about through the Winnie's turn towards the New York shore, and through the failure of the Winnie afterwards to break this sheer in time to avoid the Whitney.

The obligation to "keep out of the way," however, was not upon the Winnie, but upon the Whiteash, as the overtaking vessel. As the Winnie was meeting the Whitney, which was coming down in the opposite direction, and nearly straight ahead, the Winnie, in order to avoid the Whitney had the right upon assenting signals from her to turn to the left in order to seek a more favoring tide. At the time when those signals were exchanged with the Whitney, the Whiteash was considerably astern of the Winnie. There was plenty of water to the left for both of the tugs and tows; and the Winnie's turning to the left in order to pass the Whitney on that side, was no obstruction or embarrassment to the Whiteash. The whistles exchanged were timely and abundant notice to the Whiteash of the intention of the Winnie to go to the left. The latter could easily have conformed her movements to those of the Winnie, and she was, therefore, bound to do so. The collision occurred, primarily, at least, because the Whiteash wholly failed in this duty. Notwithstanding the signals, and the Winnie's change to the left, the Whiteash continued substantially upon the same course as before, apparently expecting the Winnie to haul under her stern, or to get straightened up river again in time. But owing to the heavy tow on the port side of the Winnie, she was slow in coming round again, though her wheel was hard-a-port.

The accident would probably not have happened had the master been in the pilot house; but he was at dinner, and the navigation was in charge of an unlicensed deckhand, who, if he understood the duty of an overtaking vessel to keep out of the way, took no timely steps to perform it. Killien v. Hyde, 63 Fed. 172; The Medea, Id. 1014.

I do not perceive any fault in the Winnie. She was heavily incumbered; she was proceeding very slowly, and after having passed sufficiently to port for the Whitney to go down on her starboard side, she put her wheel hard-a-port in order to straighten up the river, and kept it so till collision. The pilot of the Winnie claims that the collision would have been just barely avoided had the Whiteash, notwithstanding her failure to conform her movements to those of the Winnie, not starboarded her helm a few seconds before collision. The effect of this, he says, was to throw the starboard quarter of her float against the libelant's boat. I place no stress upon this circumstance, however, whether true or not. The duties and the faults of vessels are fixed before they arrive in such close proximity and under conditions in extremis. The Quaker City, 38 Fed. 153, 154.

Decree for the libelant against the Whiteash, and for the discharge of the Winnie.