## THE QUEEN CITY.

## THE EDWARD Y. TOWNSEND.

## THE JOHN W. MOORE.

(District Court, E. D. Michigan, S. D.  September 20, 1910.)

**1. COLLISION (§ 94\*)—VESSELS MEETING—FAULT OF OVERTAKING VESSEL.**

The steamer Moore was passing up the Detroit river at night when she was overtaken by the Townsend, a much larger and longer vessel, and an agreement was made for her to pass to the starboard of the Moore. As she was passing the vessels met the Queen City coming down, and an agreement was made to pass her port to port. When the Moore and Queen City were some 1,200 feet apart the Moore suddenly sheered to port, and a collision resulted in which she was sunk. The evidence tended to show that the Moore was practically following the range lines, and shortly before the collision changed from the Grassy Island to the Mamajuda range at their intersection, which required a change of course to starboard of three-quarters of a point, and that the Queen City was on a course which would have left a space of from 100 to 200 feet between the vessels at the point of passing; also, that the Townsend had been from 100 to 150 feet from the course of the Moore, but approached nearer after the latter changed to the new range. *Held*, on all the evidence, that neither the Moore nor the Queen City was in fault, but that the collision was due solely to the fault of the Townsend in approaching so near the Moore that her suction caused the latter to sheer, and brought about the collision notwithstanding all reasonable efforts of the other vessels to prevent it.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 197–199; Dec. Dig. § 94.\*]

**2. COLLISION (§ 94\*)—RULES FOR OVERTAKING VESSELS—NAVIGATING IN RIVER.**

The rule of all navigation statutes and regulations which requires an overtaken vessel to keep her course and speed, as applied to a river, relates, not to the course on which the overtaken boat is directed when the passing agreement is made, but to her normal course in the channel, and every turn and change of direction in that course must be anticipated and guarded against by the overtaking vessel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 197–199; Dec. Dig. § 94.\*

Overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

**3. COLLISION (§ 94\*)—OVERTAKING VESSELS—PASSING MEETING VESSEL.**

Where, while an overtaking vessel is passing on the starboard side of the leading vessel, another vessel is met and an agreement made between the three for her to pass port to port, the overtaken vessel may yield reasonably to the one met and the overtaking vessel must anticipate such movement and keep at a safe distance.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 197–199; Dec. Dig. § 94.\*]

**4. COLLISION (§ 98\*)—FAILURE TO SIGNAL.**

Fault cannot be predicated by the T. on the failure of the M. to sound an alarm, when the developing danger was as apparent to the T. as to the M.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 208–210; Dec. Dig. § 98.\*]

**5. COLLISION (§ 91\*)—VESSELS MEETING IN RIVER—MIDDLE OF CHANNEL.**

In the Detroit river, where ranges have been established to mark the regular path of vessels, such ranges, and not the winding and unknown midline between the irregular channel banks, fix the normal course which

affects the rights and duties of meeting boats as to their position in the channel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 187–192; Dec. Dig. § 91.*]

**6. COLLISION (§ 108*)—ACTS IN EXTREMIS.**

In the face of a sudden sheer by one boat only one minute before the resulting collision, the other boat may invoke the rule of in extremis.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 225–231; .Dec. Dig. § 108.*]

In Admiralty. Suit for collision by Frank M. Osborne and others, owners of the steamer John W. Moore, against the steamer Edward Y. Townsend, Cambria Steamship Company, claimant, by the Pittsburgh Steamship Company, owner of the steamer Queen City, against the steamers Townsend and Moore, and for Duncan McIntyre, deceased, against the owners of all three vessels. Decrees against the Townsend and owner only.

Goulder, Holding & Masten, for the Moore.

Hoyt, Dustin, Kelley, McKeehan & Andrews, for the Queen City.

Brown, Ely & Richards, for the Townsend.

DENISON, District Judge (sitting by designation). [1] At about half past 2, on the morning of October 30, 1907, the Queen City, down bound, met the Moore and the Townsend, up bound, in Detroit river, opposite Wyandotte. The Queen City and the Moore met port to port, and the Townsend was overtaking and passing the Moore on the latter's starboard. Just before the meeting, three abreast, the Moore suddenly swung over across the course of the Queen City and collided with her. The Moore was sunk and one of her crew killed; the Queen City was severely injured. Upon the theory that her change of course was caused by suction from the Townsend, passing too near, the Moore libeled the Townsend; the latter boat, by its answer, charged the chief fault to the Moore, and also accused the Queen City of fault in not yielding proper passing room; and the Queen City proceeded against both the other boats. The representatives of the sailor who was killed filed their libel against all three boats. All these cases are heard together to determine the fault.

The primary burden is clearly upon the Moore to explain that erratic course by her which was the immediate cause of the disaster. This burden is fully met. All the positive testimony and all the reasonable inferences from the undisputed facts are to the effect that this change of course was due to a sheer, resulting from the Townsend's suction, which caught the stern of the Moore and pulled it up stream for a moment, so that when this suction let go the Moore was headed partly across the channel. The conditions attending the creation and exercise of this force called "suction" seem to be imperfectly known, but many of the characteristic conditions were here present. The Townsend was more than twice as long as the Moore and was running ten miles (past the land) as against the Moore's seven. The sterns were, at the instant of the sheer, about abreast and quite close together. The draught of the Townsend, 8 feet for-

ward and 16 feet aft, whereby the full displacement occurred only at the stern, may have been of some importance. The Townsend's crew do not undertake clearly to deny that their suction was the moving cause; they only suggest that the Moore's navigators deliberately or recklessly crossed over into the Queen City's course. Such suggestion can hardly be seriously considered. No other cause, except this suction, reasonably accounts for the Moore's extraordinary action. Finding, then, that the Townsend's suction was the immediate cause of the sheer, and it being apparent that the evil effect of the suction followed on the undue proximity of the two up-bound boats, the vital question must be which boat is at fault in creating this undue proximity. This leads to a more detailed consideration of the facts.

The Detroit river channel, having a depth of more than 20 feet, varies in width from the full distance between the shores down to 300 or 400 feet, and has frequent turns and angles. In aid of navigation, the government has established, on the banks or on islands or on shoals, certain monuments called ranges, visible by day and lighted by night. Two lights, main and front, constitute a range, and, obviously, a boat going to or from such ranges, and keeping the two in line over her bow or stern, may thus pursue a fixed and known course all the way up or down the river. For example, the navigator may be going up, on a course having certain ranges in line over his bow; at a certain point, he will observe that ranges, which have been open over his quarter and have been gradually closing, are closed and in line; he will then alter his course, keeping the new ranges in line over his stern, until he comes to the next reach intersection; and so on. There is no rule requiring a boat to follow the exact ranges; it may, if all conditions permit, go anywhere in the channel; but these range courses constitute the only definite, marked path and the only track that can be accurately kept, especially at night; and to "follow the ranges" is the regular and normal course of action, just as it is with a wagon to follow the beaten track in a highway.

Coming up the river, the course is upon the North Channel ranges (stern) until it intersects Grassy Island reach; upon the latter (bow) to the Mamajuda reach; upon these ranges (stern) to Ecorse reach; upon this (bow) to the next; and so on up the river. Going down, these courses are reversed. The course distance on the Grassy Island reach is about one mile. The Moore was following the ranges up, and shortly before it struck the Grassy Island reach the Townsend, following at a higher speed, blew one whistle, indicating an intention to overtake and pass on the Moore's starboard. The Moore assented; a passing agreement was thus established. Shortly after the Moore turned on to the Grassy Island ranges, the Townsend began to lap, being from 100 to 150 feet to one side. This was, under ordinary circumstances, just a safe passing distance. When the boats were part way up this reach, the Queen City was observed coming down on the upper part of the Mamajuda range. Whistles were exchanged between the Queen City and each of the others, thus establishing a port to port meeting agreement. As the boats proceeded in this way,

nothing was observed, by any one, unusual or alarming; but from this moment of apparent safety it was probably less than two minutes —perhaps not much more than one—until the Moore was on the bottom. All agree that the first abnormal occurrence was the change of the fairly safe distance, of from 100 to 150 feet, between the Moore and the Townsend, into the dangerous proximity of from 25 to 50 feet. All agree that from this position, almost of contact with the Townsend, the Moore shot away across the course of the Queen City. Concerning nearly every other circumstance, there is the usual conflict of testimony.

First, as to the exact position of the boats. I think the proper inference from all the testimony is that the Moore was practically on the ranges at the point of intersection, and that she then followed the Mamajuda ranges, perhaps yielding slightly to the eastward for the Queen City meeting. This is, practically, the Moore's testimony, although her crew do not concede such yielding. The Townsend's crew would put the Moore much further east, and the Queen City's theory is that the Moore was much further west. Both these claims I think inaccurate. There was every reason why the Moore should substantially follow the ranges, and no reason for going to the westward, just before meeting a down-bound steamer which had a tow, and no reason for going to the eastward so as to crowd the passing Townsend, except as it would be natural to make the usual slight change of course for a port meeting. Of the three boats, the Moore was the only one able to locate herself accurately, because in line with the ranges; the other two depend on estimates as to how far the ranges were open, and such estimates must be a highly unsatisfactory means of fixing lateral distances from the range line, especially when the longitudinal distances must also be only estimated, and when such estimates must be made at night and by looking at a distant light. The only criticism on this conclusion as to the Moore's location, as far as it is based on her testimony, is that her crew say that the Mamajuda lights were in range over the starboard side of her stack, and, as this was 2½ feet from the midship line, it is therefore said she would be heading to the eastward of the range. This criticism is perhaps accurate, but is overnice. Navigators who use on board some sighting point which is not amidships, must of necessity compensate in some way for any material inaccuracy so caused. Such an inaccuracy is either too slight to be material or is compensated in some way, or else the course cannot be kept. To keep a course so determined would, if the variance was substantial, require that the ship move sideways as well as forward. The Queen City must be placed from 50 to 150 feet west of the Mamajuda range. Her evidence puts her 400 or 500 feet west; but in view of the position of the wreck, this is impossible. She was fully laden, was towing a large and heavy barge and was with the current. These things made it unnecessary and unlikely that she would make an extraordinary swing to avoid the up-bound boats, and I do not think she did. Such placing of the boats as I have adopted would leave from 100 to 200 feet between their

expected courses at the meeting point. This is the Moore's testimony, and this would have been safe.

The Townsend, at the range intersection, was 100 or 150 feet on the Moore's starboard. She concedes this distance shortly before, but claims below that point to have ported and headed on the Ship Yard lights, thereby gradually drawing away. This claim is too indefinite to be convincing. There is no testimony, oral or by chart, accurately locating these lights, and if, as counsel state, they extend across the whole Ship Yard property, as it is indicated on the chart, then a course headed on these lights might have been diverging from the Grassy Island and parallel to the Mamajuda range, or might have been nearly parallel to the Grassy Island and intersecting the Mamajuda range. The sufficient fact is that the Moore was nearly on the Mamajuda range, and that the courses of the two boats did intersect.

At the range intersection, the Moore ported three-fourths of a point to take the Mamajuda range and, perhaps, either then or just afterwards, enough more, on account of the meeting, to make nearly or quite one point. One point would put her bow about 18 feet to the eastward of the course for every 100 feet traveled forward; and if the Townsend was keeping a course substantially parallel to the Grassy Island range, the two boats would approach accordingly. If the Moore ported only three-fourths of a point and the Townsend's course diverged one-fourth of a point from the Grassy Island range, then the two boats approached each other at one-half of this supposed rate. Something of this kind is what occurred; and when the bow of the Moore was about 750 feet north of the intersection, the Townsend observed what was happening. The crew might well have thought that the Moore was coming over into them—as indeed she was, but rightfully. At about that instant, either because of the observed approach of the Moore, or because, just before or just then, the Townsend's navigators supposed that they were at the point of change in range course, the Townsend ported. Upon the oral argument, counsel said that a boat, loaded as the Townsend was, would swing approximately on its central point as a pivot, and it may be so considered; though this result is somewhat modified by the fact that the pivot is moving on the arc of a circle. On this assumption, porting one point would swing the stern of a 600-foot boat more than 50 feet to port, and in this way, the dangerous proximity would be created, if it did not already exist. In the meantime, the Moore would be running another length, so that I locate her bow about 1,000 feet above the intersection when the sheer began.

I allow 500 feet for the entire sheer; extending about 150 feet across the channel. This allowance cannot be far from right, because the boats are said to have been 1,200 feet apart, up and down stream. They were approaching at the rate of 1,500 feet per minute, and the Queen City was covering nearly two-thirds of the disappearing distance. The Queen City struck the Moore on the latter's starboard bow, and I fix the point of collision as about 100 feet west of the Mamajuda range, and about 1,500 feet above the intersection.

The Moore filled and sank, by the bow, very quickly, but if we allow one minute after the shock and before the bow grounded, the current alone would carry the boats down stream 150 feet. At the angle of impact, the resulting impulse must have carried the boats also considerably to the westward, thus leaving the grounded wreck at the point shown in the Heinze survey. The accompanying sketch shows the positions of the boats at the different times indicated:

A-A- Grassy Island Range
B-B- Mamajuda Range
M- Moore
T- Townsend
Q.C.- Queen City
1 - Position beginning to pass
2 -   "   when sheer began
3 -   "   in collision,
4 -   "   of wreck

These conclusions are, of course, only approximate, as to locations and distances, and are, in part, reasoned backwards from the position of the wreck, which I believe to be correctly shown by Heinze. The conflicts between the different surveys are discussed at length by counsel. I see no reason why, upon the technical questions of surveying involved, Heinze may not be more accurate than Van Schon, but the controlling consideration in my mind is that two witnesses, Reid and Baker, disinterested and familiar with the ranges, stood upon the wreck in daylight and observed, and say that it was upon the Grassy Island ranges, as Heinze plots it, and was not on the Mamajuda ranges, as Van Schon plots it. Further, during all the wrecking operations, up and down boats passed to the eastward, which, seemingly, would not have occurred if the wreck had been on the Mamajuda range.

I cannot accept the Queen City's theory that the boats hung together after the collision while she was able to check her headway, back, and pull the Moore 200 or 300 feet upstream and across, easterly, to the point where the wreck rested. Nor can I accept the Townsend's theory that the sheer was 400 or 500 feet across the channel, and therefore started away over toward the east bank, where the Moore had no business to be. This theory has no support, except exaggerated estimates computed from an erroneous location of the wreck.

[2] The Townsend urges the familiar rule that the overtaken boat must keep her course and speed. It seems to me obvious that this rule, applied to a river, relates, not to the course on which the overtaken boat is directed when the passing agreement is made, but to her normal course in the channel; that every turn and change of direction in that course must be anticipated and guarded against by the overtaking boat; that the latter must, at its peril, keep away far enough to permit the former safely to make these changes and turns. Such seems to be the established rule (The Hasbrouck, 93 U. S. at page 407, 23 L. Ed. 962).

[3] It seems also obvious that if a meeting occurs, and if all boats join in a meeting agreement, the overtaken boat may yield reasonably to the boat met, and the overtaking boat must anticipate this also. The Whiteash (D. C.) 64 Fed. 893. This absolute duty to keep away a safe distance, the Townsend did not meet. The reason may be, as indicated by her captain's examination before the inspectors, that he erroneously thought he was over along the east bank; but whatever the reason, the fact is quite clear. The Moore did not go to starboard, except as it was her right and duty under this rule to do so. The collision was the direct and not unnatural result of the Townsend's failure to maintain a safe distance, under these conditions which she should have anticipated; and the fault is, therefore, to be fixed upon that boat.

[4] Complaint is also made of the Moore for not giving warning to the Townsend of the danger. The Moore did blow a four-blast signal, which seems to be regarded as a request to check, but there is conflict as to when that was, whether more than one, and whether

the Townsend paid any attention. However that 'may be, all danger existing, at any time, from any cause, was obvious to the Townsend at least as early and as clearly as to the Moore. As to the gradual drawing together of the boats, on converging courses, the Townsend knew that she had not ported on the range intersection, while the Moore could not know this fact until the convergence became pronounced. As to the sudden swing of the Townsend's stern, at the moment when most dangerous, this could not be anticipated by the Moore. Hence, fault cannot be predicated on the Moore's failure to sound an alarm.

The Queen City is charged with fault (1) for not keeping further to the starboard; and (2) for not porting and reversing when she saw the Moore sheer.

[5] As to the first point, the argument is that even if the Queen City kept to the westward of the range course, she was east of mid-channel, and that, anticipating a three-abreast meeting, she should have given the other two boats at least half the channel. The Queen City, judging only by the lights, had much less reason than the up-bound boats to anticipate such a meeting, but, even if anticipating, the Queen City met its full duty when it 'swung away reasonably from the ranges. True, the ranges do not mark mid-channel, but they do mark the normal and regular path of vessels, and regulate meetings under ordinary conditions. It is these ranges, and not the winding and unknown line between the irregular channel banks, which should be the normal basis of fixing the rights and duties of meeting boats. Here, the Queen City captain knew there was ample channel room for both the up boats east of the range, and he was justified in assuming that they would both stay there. If the Moore had held on, as the Townsend now claims she should have done, upon the Grassy Island range, until the Townsend was well past, this would have taken her a thousand feet or so past the intersection and into the Queen City's course, a collision at about the location of the wreck would have been likely, and I think the Moore would have been in fault.

As to the second point, I am satisfied that everything done or not done either by the Queen City or by the Moore, after the sheer started, was in extremis. From the time the sheer started until the collision was not over one minute. Less time than this intervened after the Moore had swung so that her lights would indicate that she was crossing into the Queen City's course. The Queen City was certainly justified in waiting for a few seconds, at least, to see whether the Moore did not recover from the sheer. Making these deductions, we have hardly more than 30 seconds' time during which it can be said that perhaps the Queen City ought to have appreciated what had happened. It must also be remembered that the Queen City had a barge in tow upon a 500-foot line, and that it could not stop and back, except with danger of collision with her tow. If, a half or three-quarters of a minute before the collision, she had ported as much as possible and gone to starboard, she might have avoided the collision, but, on the other hand, she might not, and might also have brought her barge into collision with the Moore.

Looking back, with our present knowledge of the Moore's actual course, it would seem that the Queen City could have avoided her by starboarding and going under her stern, but, at the moment, that would have seemed a very reckless maneuver. The court cannot say, putting itself in the place of the Queen City's captain at that moment, that any other course should have then appeared to him clearly better and safer than the course which he did take. Thirty or forty-five seconds for consideration, in the face of entire uncertainty as to when the Moore would recover, did not call for any other course.

The Moore did everything possible to break the sheer. The captain doubtless hoped and perhaps expected that she would recover before reaching the Queen City's course, but, even with our present knowledge, nothing else appears that he could have done.

I have examined the cases cited by counsel. So far as they hold that the overtaken boat contributed to the injury, I think the circumstances fully distinguish them from the present case. Counsel especially relies upon The Edward Smith, 135 Fed. 32, 67 C. C. A. 506; but in that case, it appears that the danger came from passing in a narrow channel, in violation of established rules, and that the overtaken boat had consented to that kind of a passing, while, in the present case, the Moore consented to a passing in a wide channel, where there was no reason for not consenting, and the Moore's acquiescence in a passing in progress at a distance close to the margin of safety was on the necessarily understood condition that the Townsend would maintain at least that distance during the entire passing, and in spite of the well-known turns in the regular course.

Counsel may prepare a decree in accordance with this opinion.