## THE ENERGETIC. GOODWIN–GALLAGHER SAND & GRAVEL CORPORATION v. UNITED STATES. M. & J. TRACY, Inc., v. SAME.

(District Court, E. D. New York, June 23, 1922.)

1. Collision ⬡94—Overtaking vessel bound to respect rights and position of other in narrow channel.

One vessel, overtaking another in a narrow channel, was bound to respect the rights and position of the other, unless the other either violated some rule of navigation herself, and thereby caused the collision, or in some way led the overtaking vessel into a trap.

2. Collision ⬡105—Collision in narrow channel held fault of overtaking vessel.

Evidence *held* to prove that collision in narrow channel was fault of overtaking vessel.

In Admiralty. Libels by the Goodwin-Gallagher Sand & Gravel Corporation and by M. & J. Tracy, Inc., owners of the boat Detroit, against the United States, with the steam tug Energetic impleaded. Petitions dismissed.

Decree affirmed, 297 Fed. 673. See, also, 288 Fed. 86.

Foley & Martin and James A. Martin, all of New York City, for libelants.

Horace M. Gray, of New York City, for the United States, claimant of the Lithopolis.

Park & Mattison, Samuel Park, and A. V. Lynch, Jr., all of New York City, for Tice Towing Line, claimant of the Energetic.

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

CHATFIELD, District Judge. These actions were brought for injuries received by the Detroit and the Herman, barges in the first tier of a tow of four boats which on September 9, 1920, was taken by the tug Energetic through the Kill von Kull, in broad daylight and with a flood tide. The tow, with three boats abreast and with one boat behind the Detroit, reached a point beyond the channel into Newark Bay, when the Lithopolis, a steamer some 260 feet in length, was observed overtaking the Energetic at such a rate as to make it probable that the Lithopolis would pass the Energetic and her tow in the exceedingly narrow passage between Shooters Island and the Staten Island shore. The flood tide continues to the westward past Shooters Island until it meets the flood tide coming up the Arthur Kill along the western side of Staten Island. This meeting point of the tide is a few hundred feet west of Shooters Island, and at the point of meeting the two tides join and pass up into Newark Bay.

The tow of the Energetic occupied a space some 110 feet wide. The channel passing Shooters Island narrows to less than 450 feet, and the buildings upon Shooters Island obstruct the view around the bend. A large Pennsylvania tow of some 18 barges, coming up the Kill toward New York Bay, could not be seen by the Energetic until she had approached comparatively close to the western corner of Shooters Island. In the meantime the Lithopolis had drawn closer and had previously blown a one-whistle signal to the Energetic. The Energetic had blown a bend signal and also a one-whistle signal to the Pennsylvania No. 35, which she expected to pass port to port just west of the corner of Shooters Island. Evidently the Lithopolis understood this one-whistle signal of the Energetic to No. 35 to be a signal to the Lithopolis that the Energetic accepted the notice of intention on the part of the Lithopolis to pass the Energetic in this exceedingly narrow channel. The Lithopolis did not observe the No. 35, although apparently the officers of the Lithopolis were on duty and watching the situation, and did not hear any whistle signals from the No. 35 before the Energetic began to move over under a port helm toward the Shooters Island side, in order to give the No. 35 room to pass port to port.

[1] Substantially the only conflict or dispute of fact between the witnesses arises as to whether the single whistle signal from the Energetic was to the Lithopolis or to the No. 35, and whether the Energetic promptly blew alarm whistle so as to warn the Lithopolis that the Energetic did not accept the Lithopolis' notice of intention to pass. The rules applying to the cases are definite in their terms. The Lithopolis was an overtaking vessel and was bound to respect the rights and position of the Energetic unless the Energetic either violated some rule of navigation herself, which violation of itself was the cause of the collision, or unless the Energetic in some way led the Lithopolis into a trap. The Whiteash and The Winnie (D. C.) 64 Fed. 893.

The point of Shooters Island in such a narrow channel, with view obstructed and with a bend immediately beyond the corner, presents a situation in which course and speed are relative terms. The course cannot be a steadily held compass course. The Queen City (D. C.) 189 Fed. 653. It cannot be a course in a straight line, nor at an abso-

lutely constant distance from either shore. While passing through the Kill opposite Newark Bay, the Energetic was on the starboard or Staten Island side of the channel, which there widens out because of the entrance to Newark Bay. But, in the narrowing space past Shooters Island, the Energetic was approximately in mid-channel, and was bound to work over toward the northern or Shooters Island side, if any vessel was met on a passing course. The pilot upon the Lithopolis concluded, because the Energetic was not close to Shooters Island, that she might be intending to land her tow on the Staten Island side at one of the piers of Mariners Harbor, just opposite Shooters Island. This impression was evidently substantiated in the mind of the pilot of the Lithopolis when the one-whistle signal was blown from the Energetic, and the Lithopolis proceeded at such speed that her way could not be stopped when the Energetic was observed pulling over toward the starboard side of the channel, in order to give room for the Pennsylvania tow which then was approaching. As the movements of the Lithopolis became apparent to the Energetic, the Energetic blew an alarm, but evidently too late to allow the Lithopolis to stop her headway or to change her course sufficiently toward Shooters Island to avoid the collision.

[2] According to the testimony, there was room between the Energetic's tow and Shooters Island for the Lithopolis to have moved up alongside of the tow of the Energetic without collision, if her way had been stopped. The movements of the Energetic and her position in the channel are corroborated by the testimony of the captain of the Pennsylvania No. 35. Under the circumstances, the Lithopolis, being the burdened vessel and at best having placed herself in a position from which she could not extricate herself, through failure to observe or anticipate the approach of the Pennsylvania tow, it is impossible to avoid the conclusion that the Lithopolis should be held responsible for the fault on her part.

The most difficult question in the case is whether the Energetic was entitled to rely strictly upon the overtaking rule when approaching such a narrow spot, with the view obstructed, as that of the corner of Shooters Island, and whether the Energetic should have realized that a single whistle to a boat approaching, but which could not be seen by the Lithopolis, would be so evidently misleading or ambiguous as to be an act of negligence on the part of the Energetic, if not followed immediately by alarms for the benefit of the Lithopolis. The Energetic had the right of way; her signal to the Pennsylvania tow was correct. The Energetic could not have been so close over to Shooters Island that the Lithopolis could not have yielded somewhat to the north if the Lithopolis had not kept on her course. This is made apparent from the fact that the barges of the Energetic were driven by the collision far enough toward Staten Island so that the Pennsylvania tow passed them starboard to starboard. This also shows that the Pennsylvania tow could not have been immediately on top of the Energetic at the time of the collision.

It is also apparent that the Lithopolis could not have gotten into such a position as to strike the barges of the Energetic's bow with her cut water, as was testified by some of the witnesses. The colli-

sion must have been with the bluff of the bow of the Lithopolis, and the movement of the barges toward Staten Island must have been on a diagonal course, resulting from the effect of the tide, the way of the barges, and the thrust of the Lithopolis. The facts accentuate the charge that the Lithopolis was proceeding at too great speed in order to look out for the movements of the Energetic, and indicate that the Lithopolis was mistakenly relying upon the Energetic's one-whistle signal, and was approaching the bend at the corner of Shooters Island without due regard for the Energetic, under the overtaking rule.

The libelants should recover against the Lithopolis, and the petitions against the Energetic should be dismissed.