In the Matter of the Complaint of MOLAI SHIPPING CORPORATION, as Owner of the M/V GEORGIOS G, for Exoneration from or Limitation of Liability.

Bruno CAPPELLINI, as Administrator of the Estates of Jose Ramon Jiminez Fernandez, Jose Del Carmen Mendez Tamarez, Jaillal Kisson, Luis M. DeLeon Pichardo, Francisco Nicarnor Ramirez Espinosa, Agustin Compusano Diaz, Reinaldo Enrique Cardona, Rafael Berroa, Enrique Mendez Ascencio, decedents, Plaintiff,

v.

BRADFORD SHIPPING CORP. and Starlight Trading Co., Inc., Defendants.

Nos. 81 Civ. 0675, 83 Civ. 0389.

United States District Court,
S.D. New York.

Aug. 4, 1983.

Freehill, Hogan & Mahar, William M. Kimball, New York City, for petitioner and defendants; John J. Walsh, Peter S. Wiswell, New York City, of counsel.

Speiser & Krause, P.C., New York City, for plaintiff; Lawrence B. Goldhirsch, Susan P. Bodner, New York City, of counsel.

OPINION

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

These two consolidated actions center about a disaster in the Caribbean Sea when the captain, officers and other members of a 27-man crew and one stowaway went to a watery grave. Their vessel, the M/V Georgios G, disappeared off the coast of the

Dominican Republic during the most severe hurricane ever recorded to have passed south of the island of Hispaniola (Haiti and the Dominican Republic). The only trace of the vessel, after an intensive search by the United States Coast Guard and others, was the discovery of a self-inflating life raft belonging to the M/V Georgios G several days after its last communication with another vessel. Those who perished in the disaster were eight Dominicans, seven Hondurans, five Colombians, four Greeks, two Guatamalans, one Chilean and one Guyanan.

Molai Shipping Corporation ("Molai" or "petitioner"), a Panamanian corporation, the owner of the M/V Georgios G, petitioned this Court for exoneration from or limitation of liability.[1] Relatives or dependents ("claimants") of ten deceased seamen asserted claims in the limitation proceeding.[2] All the claimants are residents and citizens of the Dominican Republic and are represented by the Public Administrator of the Surrogate's Court, New York County. The Administrator denied that Molai was entitled to exoneration or limitation of liability upon the ground that the M/V Georgios G was not a seaworthy vessel; that she could not withstand the sea and weather conditions prevailing prior to and at the time of the vessel's loss; that the master and others in charge of the vessel were negligent in putting her to sea under the then prevailing conditions and were further negligent during its operation thereafter; and that petitioner had privity or knowledge of unseaworthiness or negligence. The petitioner denied the allegations and in addition, set up an affirmative defense that the claimants had executed general releases upon payment of fair and reasonable amounts in settlement of their respective claims. The Administrator, in response thereto, charged that the releases were void because they were not executed freely, without deception and with full understanding of their import.

Thereafter the Administrator commenced a separate action in this Court under the Jones Act[3] and Death on the High Seas Act[4] on behalf of the same claimants. The defendants in that action are Starlight Trading Co., Inc. ("Starlight"), the time charterer of the vessel, and Bradford Shipping Corp. ("Bradford"). The complaint alleges that each defendant was the operator of the M/V Georgios G and employed the crew; that the disaster was due to the negligence of those defendants and their failure to provide the crew with a seaworthy vessel. Damages in the sum of $750,000 are claimed on behalf of the next of kin and dependents of each deceased seaman. Starlight and Bradford deny liability. The limitation proceeding and the Jones Act action were consolidated and tried to the Court.

■ We first consider petitioner's claim for exoneration from or limitation of liability. While the rule is that a crew member or the representative of a deceased crew member seeking damages against the owner of a vessel has the burden of proving that the ship was unseaworthy or the owner was negligent and that such unseaworthiness or negligence was in fact a cause of injury or death, petitioner here as an initial matter in the limitation proceeding assumed the burden of establishing a prima facie case that the vessel was seaworthy and that there was no negligence in its operation from the time it left the port of Rio Haina until it disappeared.[5] And if it fails and unseaworthiness or negligence is

1. 46 U.S.C. §§ 183, et seq.

2. Petitioner settled with the relatives and dependents of the other decedents.

3. 46 U.S.C. § 688.

4. 46 U.S.C. § 761 et seq.

5. Petitioner's Post Trial Brief at 1. *See Farrell Lines, Inc. v. Jones,* 530 F.2d 7, 10 (5th Cir. 1976); *In re Marine Sulphur Queen,* 460 F.2d 89 (2d Cir.), *cert. denied,* 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972); *Binstock v. Friedman,* 330 F.2d 267, 268 (2d Cir.1964); *The S.S. Hewitt,* 284 F. 911, 912 (S.D.N.Y.1922); G. Staring, *Limitation Practice and Procedure,* 53 Tul.L.Rev. 1134, 1174–77 (1979). *But see Terracciano v. McAlinden Constr. Co.,* 485 F.2d 304, 307–08 (2d Cir.1973).

established, the petitioner, has the burden of proof that its officers and managing agents lacked privity or knowledge.[6]

The M/V Georgios G, a Panamanian registered, 4636 gross ton vessel, was Japanese built in 1965 as a log carrier for rough weather Pacific trade. She was 355 feet long, well designed, inherently stable and tight—basically, a seaworthy, steel bulk carrier. She had four holds and four hatches covered by wooden hatch boards and was equipped with radar, radio direction finder, echo sounder and recorder, gyrocompass, illuminated magnetic compass and VHF radio. The ship had five double bottomed tanks port and starboard for seawater ballast and forepeak and afterpeak tanks for potable water and fresh water ballast, with total ballast capacity of 1,762.52 tons. Using her own valves and pumps, she could completely ballast herself with seawater in four hours both while stationary and while underway.

Molai bought the Georgios G in 1978. While under charter to Starlight and until her demise she was mostly on a "milk run" of one month round trip voyages carrying fertilizer from the United States Gulf ports to the Dominican Republic, and after unloading of that cargo, there picking up sugar cargo for delivery at a United States Gulf port. During her ownership by Molai the vessel was certified by Bureau Veritas, an international survey inspection agency, and was fully classed according to its highest standards. Survey reports in April, May and June 25, 1980, the last six weeks before the vessel went down, established that the Georgio G's appurtenances, machinery, boiler and safety equipment were in class—that is, in good working condition and that the vessel was seaworthy.

Rio Haina is an open port on the southern coast of the Dominican Republic. It is exposed to wind and waves and dangerous for ships during a tropical storm. It was a common practice for ships to leave Rio Haina before an approaching hurricane because it was deemed safer to leave the port than to remain there and risk damage to vessels and to the port. Several months prior to the incident at issue a severe hurricane had washed two ships into the town of Rio Haina. In earlier years the port experienced several bad accidents and vessels sank.

On August 2, 1980, the Georgios G was at the port of Rio Haina, having by noon of that day discharged her cargo of fertilizer and shifted her berth to allow another vessel to unload, waiting orders from Starlight, her charterer. There were two other vessels in the port, the M/V Anastasia II, a 7600 deadweight ton, 14 knot speed ship under the command of Grigorios Kotzamanoglov, a licensed Greek captain, and the M/V Barahona, a 10,100 gross ton vessel, under the command of Captain Jose P. Zulueta, Jr., a Phillipine licensed officer. The depositions of both were read into the trial record.

On August 3 at 0.00[7] hours a tropical storm which became Hurricane Allen was 962 miles east of Rio Haina. Commencing at that time a series of advisories were issued every few hours from the National Hurricane Center at Miami, Florida, advising of a tropical storm with a track of 280 degrees at various speeds which increased as reported in each advisory until it reached hurricane status. It was first called Hurricane Allen in Advisory No. 8 issued at 1500 hours on August 3.

The captain of the Anastasia II on August 3 decided to ride out the storm in port, but his decision was of no avail. On August 4 at noon the Dominican Haiti island was put on hurricane "watch" by the National Hurricane Center.[8] The storm then had

---

6. *See* cases cited *supra* note 5. *See also Coryell v. Phipps,* 317 U.S. 406, 409, 63 S.Ct. 291, 292, 87 L.Ed. 363 (1943); *In re Petition of Henry Du Bois' Sons Co.,* 189 F.Supp. 400, 401 (S.D.N.Y.1960).

7. All of the references to time in this ·opinion are Dominican Republic time.

8. Three levels of alerts are given for hurricanes: an "advisory," which means that a hurricane is in the general area; a "watch," which means that one may come to a specified location, and a "warning," meaning that one probably will come to a specified location. A warning was

maximum sustained winds of 120 knots per hour, gusting to 140 knots per hour. At about that time the Rio Haina harbor master ordered the captains of the three vessels to leave the port. The Barahona, after bunkering, left the port at 1712 hours. The Georgios G, secured for sea but high out of water because it had no cargo, departed next at 1810 hours. Within ten minutes she was followed by the Anastasia II with 800 to 1,000 tons of fertilizer still aboard. Both the Georgios G and the Anastasia II headed south and slightly west in an effort to cross ahead of the track of the oncoming hurricane and into the safe navigable south semicircle. The Barahona took a course to Puerto Rico. An advisory issued at or about the time the vessels departed placed the movement of the hurricane west or 280 degrees at 18 knots, diameter of eye eight nautical miles, maximum sustained winds 130 knots and gusts to 150 knots.

The details of events that followed are based upon the testimony of Captain Kotzamanoglov of the Anastasia II. The Anastasia II was in VHF voice communication with the Georgios G following departure from the port of Rio Haina, which contact continued until 0500 hours August 5.

After leaving Rio Haina on August 4, the reported and relative positions of Anastasia II and the Georgios G were by dead reckoning.[9] These were based upon the length of time the Anastasia II steered her courses multiplied by its estimated 15 knot speed determined by the number of her engine revolutions. At first the two ships continued southwesterly, occasionally altering course more to the west to take greater advantage of the winds. But at 0100 hours on August 5, after receiving a weather re-

port which indicated to him that he could not successfully cross ahead of the track of the hurricane into the south semicircle, the captain of the Anastasia II reversed course and proceeded northward. The Georgios G did the same. At 0300 hours August 5 the captain of the Anastasia II radioed weather reports to the Georgios G, having learned that her radio officer was sick. The Georgios G was then twenty miles off the starboard beam of the Anastasia II at 150 degrees. The Anastasia II then was overtaking the Georgios G. Between 0300 and 0500 hours the captain of the Georgios G informed the captain of the Anastasia II that his vessel was pitching and rolling but he did not say it was in trouble.

At 0500 hours the last communication occurred. The Georgios G, which then was south of the Anastasia II and closer to the eye of the hurricane, reported that because of the weather she could not steer and altered her course to 140 degrees, which was toward the hurricane eye and the most intense part of the storm. At this time, according to records, the wind speeds were at an all time high for Caribbean hurricanes—sustained wind speed of 172 miles an hour with gusts that reached 196 miles an hour.

Petitioner and claimants relied upon expert testimony with the usual difference of opinion. Petitioner's expert estimated the force of a 196 mile per hour wind on the vessel as 800,000 pounds, or a pressure of 90 pounds per square foot. The significant wave height was twenty feet.[10] The petitioner's expert, applying a more conservative estimate of 150 mile per hour wind and resulting pressure of 60 pounds per square

never given to the Dominican Republic for Hurricane Allen.

**9.** Dead reckoning was defined by an expert witness as the "location of a position of a ship based upon estimates of the ship's speed times the time the ship has travelled a given course." Thereafter, a star or a sun fix would be taken and the actual position would come out different from that taken by the moving ship. The difference was determined to be the effect of the moving currents which the master could not anticipate or include in his dead reckoning

position. The current charts of the world today are primarily based on the difference between dead reckoning positions and actual fixed positions.

**10.** Significant wave height is the average of the highest one-third of all waves present. Out of 100 waves the highest thirty-three would be averaged to give a significant wave height. Petitioner's expert testified that with a significant wave height of twenty feet, the highest wave, which statistically would occur about every two hours, would be thirty-seven feet tall.

foot, was of the view that the force could readily blow the bridge apart and blow out the port holes. His judgment was that the vessel might have been hit by a tornado, filled with water and capsized. It was also his opinion that the combined effect of record high winds and strong wave action with waves breaking on the ship contributed to the capsizing of the vessel; that the lack of cargo gave maximum effect to the wind and waves by exposing more of the ship's surface areas to these forces. He also thought the ship was subject to the "Bernouilli" effect—that is, that the winds blowing alongside the ship created regions of low pressure outside the ship leading to explosions inside the ship where the air was at normal pressure. He was of the view that if the ship had not lost its steering it could have steered away from the storm with a good likelihood that the vessel would have weathered the storm.

The claimant's theory based upon its expert's opinion is that the Georgios G was unseaworthy when it left Rio Haina in that she had no cargo in her holds, which was extremely dangerous in hurricane weather because it made the ship unstable and difficult to steer since the propeller and rudder were not sufficiently submerged, rendering the vessel unmanageable in a hurricane.

■ When the Rio Haina harbor master ordered the captains of the three vessels to leave the port, their decisions were limited. The choices were to refuse the harbor master's order and face arrest and imprisonment, which would have left the vessel without command and exposed it to the hazards of the oncoming hurricane, or to sink the vessel at the pier with the prospect of its being salvaged after the hurricane subsided, or to comply with the order and leave the port and head for sea. As to sinking the vessel, this presented other problems, since it required knowledge of the depth of the bottom, whether it was mud, whether other submerged vessels or derelicts were there, and finally required

equipment from the shore, which it was unlikely the authorities would supply, having ordered the vessel to leave. The claimants' expert conceded that under the circumstances of the three options, the master of the Georgios G chose the best,[11] and made a prudent judgment in deciding to obey the order. Indeed, he acknowledged that since it was a "tough decision" even if the master had made the wrong choice, he could not be faulted for negligence.[12] Having decided to leave port, the master had to take the vessel to sea as she was, even though without cargo. The expert, accepting that the master was competent, did not dispute that during the more than four hour period that elapsed from the time the master was ordered out of port until the vessel's departure, as a prudent master, he would have utilized the time to completely ballast the ship and that there was no evidence presented upon the record that the ship's ballast pumps were incapable of performing their function. The expert also testified that the Georgios G was basically seaworthy, well built, well designed and inherently stable.[13] There is no basis upon which to hold the vessel qua vessel unseaworthy at the time of departure from the port, and under all the circumstances, it was not negligence for the master to proceed to sea.

■ Claimants' expert also contended that the ship was unseaworthy to encounter Hurricane Allen in that it had wooden hatch covers which were not watertight and probably became loosened by the intense wind, thus enabling water to run into the holds. The expert charged that loose water in the holds would create a "free surface" effect whereby, as the ship pitched and rolled due to the action of the wind and waves, the inertial effect of the loose water in the holds would exacerbate the degree to which the ship tilted until at some point the ship could no longer right itself and capsized suddenly. This theory, however, is based upon an assumption that the Georgios

11. Tr. at 774.

12. Tr. at 741.

13. Tr. at 671, 689, 706.

G's hatch covers were not watertight. The evidence showed that the wooden boards which covered the hatches were fastened securely and covered with tarpaulins to make them watertight as follows: The boards lay fore and aft across each hatch with their midportions resting on athwartship strongbacks and their ends in the flanges of athwartship beams. Tarpaulins covered the boards at each hatch and were secured with wedges hammered into cleats on the coaming of the hatches to make them watertight. A net was placed over the tarpaulins and tied to studs to protect the tarpaulins. The captain of the Anastasia II testified that he observed that the Georgios G's hatches were covered with canvas when she left Rio Haina and also that the Georgios G's crew had secured the ship for sea before it left port. Thus there is no reason to assume that the hatch covers were not fully secured and watertight to encounter the storm.

Moreover, there were inconsistencies that undermined the testimony of claimants' expert as to the wooden hatch covers. Thus he conceded that the ship had been originally outfitted with wooden rather than steel hatch covers by the Japanese for good reasons of design and construction, due to the extra large hatches on the ship and that in its original Pacific log trade the ship would have been expected to encounter severe heavy weather. Another inconsistency is his disavowal of any contention that petitioner should have replaced the wooden hatch boards with steel hatch covers. In-

deed, he conceded that to have done so would have, to some extent, decreased the ship's inherent stability.

The evidence further established that it is not uncommon for ships to be fitted with wooden hatch boards; that ships so equipped have gone through hurricanes without sinking; and that many ships with hatchboards have been surveyed by Bureau Veritas and declared seaworthy. Under all the circumstances, the Court finds that the ship was not unseaworthy due to the wooden hatch covers.

Upon a word-by-word re-reading of the trial transcript, a study of the numerous exhibits, reference to the Court's trial notes made during the progress of the trial, and an appraisal of the demeanor of the expert witnesses, the Court concludes that the vessel before and during the storm was seaworthy and that it was not negligently operated. The disaster could not have been avoided. Hurricane Allen was the sole and proximate cause of the loss of the Georgios G.[14] The Court does not accept the conceptual theories advanced by the claimants' expert,[15] who with respect to some matters indicated that the area of inquiry was "very speculative" and "a guess."

This disposition terminates not only the petitioner's proceeding but necessarily the action on behalf of the claimants against Starlight and Bradford, who upon the entire record are also entitled to judgment in their favor. However it is desirable[16] to consider and dispose of the claimants' contention, to which much testimony was also

14. *Cf.* Karina T., 1966 A.M.C. 1543, 1551 (D.N. J.1964), *aff'd per curiam,* 354 F.2d 239 (3d Cir. 1966).

15. *See Federazione Italiana Dei Cors A. v. Mandask Compania De V.,* 388 F.2d 434, 437 (2d Cir.), *cert. denied,* 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968); *Nuzzo v. Rederi,* 304 F.2d 506, 511 (2d Cir.1962); *Perma Research & Development Co. v. Singer Co.,* 402 F.Supp. 881, 897 (S.D.N.Y.1975), *aff'd,* 542 F.2d 111 (2d Cir.), *cert. denied,* 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976).

16. The trial and pretrial proceedings were protracted, including trips abroad by counsel for depositions, and it is evident that the parties to date have been put to considerable expense.

Should higher authority disagree with this Court's disposition on the seaworthiness and negligence issue, the Court will have before it the record on the release claim, which may avoid further proceedings. *Cf. Gratian v. General Dynamics, Inc.,* 587 F.2d 121, 122 (2d Cir. 1978) (per curiam) (It is a "very old and very sound principle of judicial administration" to reserve decision on a motion for directed verdict and submit the case to the jury so that should an appellate court disagree with the trial judge, the verdict may be reinstated and the time and expense of a second trial avoided.). *See also Lindeman v. Texatron, Inc.,* 229 F.2d 273, 276 (2d Cir.1956); *Fratta v. Grace Line, Inc.,* 139 F.2d 743, 744 (2d Cir.1943).

directed, that the general releases executed by them in settlement of their claims were void because they were not executed freely and with full understanding of their import.

Our Court of Appeals recently held the rule, applicable to a seaman as a ward of the court, that subjects his release to strict judicial scrutiny and puts the burden of proof upon the shipowner to establish its validity, does not apply to members of his family, who are "landbased" with ready access to the advice of friends and the guidance of counsel.[17] Petitioner's trial counsel, with commendable candor, questioned whether the announced rule will be upheld by highest authority and undertook the burden of proving that the releases were validly executed.[18]

The petitioner urges that in view of a substantial issue of seaworthiness and negligence, choice of law problems, doubt in a number of instances that the claimed dependent of a seaman was in fact a dependent, the uncertainty of the amounts allegedly contributed by a deceased seaman to the alleged dependent, that under these and all the circumstances, in each instance, the amount paid in settlement was fair and reasonable and there was no overreaching of those who executed the releases.

Liability was by no means clear. Indeed upon the facts there could be no certainty of judgment as to this issue without a judicial determination. Ultimately, as the ruling herein indicates, the shipowner, the charterer and the operator of the vessel did prevail on the basic liability issues. The uncertainty of result upon a trial obviously is an important consideration in evaluating the settlement value of a claim.

So, too, the choice of law to be applied was the subject of sharp dispute. The particular applicable law significantly affects the value of a claim. The only item the lawyers agreed upon was that federal law governed the basic issue of liability both in the limitation proceeding and the wrongful death claims but differed as to other matters. The claimants' lawyer contended, post trial, that Dominican law governed damages and also that Dominican law barred the limitation proceeding.[19] On the other hand petitioner's lawyer contended that United States law applied to all issues; however, if Dominican law applied, then the Dominican Republic would apply Panamian law, the law of the flag, under which recovery is limited to payments due under the Workmen's Compensation statute, which in each instance would be considerably less than the amounts paid to the dependents under the releases.[20] The dispute as to these contentions could not be resolved absent a judicial ruling upon a trial.

Against that background of conflicting contentions we turn to the release issue. After the Georgios G was lost, Bradford, the operator, retained Freehill, Hogan & Mahar ("Freehill"), the New York attorneys for Molai's protection and indemnity association, West of England, to undertake settlement of all potential claims arising out of the disaster. Freehill engaged Raul Santiago ("Santiago"), a Miami based investigator of maritime claims who had formerly practiced law in Cuba and is fluent in Spanish and English, to determine the identities and whereabouts of the deceased crewmen's dependents in the Spanish speaking countries of the Caribbean area. In August 1980, Santiago went to the Dominican Republic. He located the families of the decedents and visited them in their homes, introducing himself as a lawyer for or representative of the shipowner. He informed the families that the shipowner wished to pay for the loss of the men and gathered information to help Freehill evaluate settlement figures, such as the ages of the potential claimants, their relationship to the dece-

---

**17.** *Lampsis Navigation, Ltd. v. Cortes,* 694 F.2d 934, 937 (2d Cir.1982), *reh'g en banc denied* (January 21, 1983).

**18.** Tr. at 331.

**19.** Claimants' lawyer's contention as to which law applied to which issues shifted somewhat from the position taken at trial. *See* Tr. at 29–35, 1037–38.

**20.** *See* Petitioner's Proposed Conclusions of Law Nos. 6, 7; Tr. at 10–14.

dents, amounts of claimed contribution for support, and other significant matters.

After receiving this information, Freehill authorized Santiago to settle with the families of each decedent in amounts ranging from $20,000 to $45,000, depending upon the facts in each case. Santiago then returned to the Dominican Republic in February 1981, again visiting the potential claimants in their homes. What transpired during this second visit is disputed: Santiago contends he negotiated the amounts of the settlements with the claimants, while they all say that no specific dollar amount was discussed during this second visit. The Court does not have the benefit of demeanor evidence in resolving this dispute because neither the claimants nor Santiago testified at the trial;[21] instead, their deposition testimony was introduced into evidence. But given that all the claimants' versions corroborate each other, and there is no indication they were present during one another's depositions, the Court resolves the dispute in their favor. It was only upon Santiago's third visit to the Dominican Republic in mid-March 1981, when the settlements were consummated, that he communicated a specific offer to the claimants.

Santiago conducted the whole process of communicating the offers to and obtaining releases from all the claimants during one day—March 19, 1981. On the morning of that day, he arranged for a chauffeur driven car to bring each claimant from his or her home to a hotel where Santiago was staying; they were told that Santiago was ready to pay for the deaths of the men. The claimants were not notified in advance that Santiago would be in Santo Domingo on that day to conclude the settlements. Most of the claimants were not represented by lawyers; three were represented by their attorneys; some who also had retained lawyers either failed to ask them to attend or the lawyers were not available

that day. None, however, requested more time to enable them to have an attorney present.

Santiago conferred with each family separately. He offered them sums within the range authorized by Freehill on a take-it-or-leave-it basis. He did not suggest that they might defer consideration of the offers; none, however, requested more time to think it over. He told several claimants that they did not need to have an attorney present, although they concede that he did not tell them that they could not have an attorney present. As to those who were represented by attorneys, he raised no question of their right to participate in the discussion. He did not explain to the claimants what rights they might possess under United States admiralty law—indeed, he admits that he did not have sufficient knowledge of admiralty law to have done so. All the claimants, including those represented by the attorneys, accepted the offers. The attorneys sought to obtain larger sums, but Santiago adhered to the amount he had offered to their clients. Each claimant signed every page of releases written in Spanish relinquishing any and all claims they might have against Molai, Bradford, Starlight, West of England, and the Georgios G.

■ Based on the foregoing, claimants contend that the releases are void because they were overreached—that they were coerced into signing the agreements; that they signed under the control of the shipowner and without access to independent advice; that Santiago made misrepresentations of fact and law; and that the consideration they received was inadequate. As to coercion, there is no evidence of any economic coercion in the sense recognized by the cases of a threatened withholding of a benefit concededly due an individual unless he signs a release.[22]

---

**21.** Santiago's whereabouts were unknown at the time of trial, and the claimants were unable to come to New York to testify due to difficulties with obtaining visas and their inability to pay for the cost of the trip.

**22.** *See, e.g., German v. Carnegie-Illinois Steel Co.,* 169 F.2d 715 (3d Cir.1948); *Kress v. Long Island R.R.,* 526 F.Supp. 856, 858 (S.D.N.Y. 1981); *Prockl v. National Bulk Carriers, Inc.,* 110 N.Y.S.2d 265 (1951); Edelman, *Maritime Injury and Death* 444–45 (1960). *Cf. Fitzwater*

So, too, claimants' contention that they were in an isolated position under the control of the shipowner without access to independent advice when they signed the releases is without support. Prior to receiving the settlement proceeds, they had conferred with Santiago on two separate occasions at their homes. On the third occasion, when they received the payments, they were in their home community, free to go or not to go to the hotel as they chose, and also free to bring friends, relatives, or an attorney to the hotel with them, as indeed several did. Their position is in no way akin to that of a seaman who signs a release at the behest of his employer while the seaman is away from home either in a strange port or aboard ship.[23] Further, that most of the claimants were unrepresented by counsel when they signed the releases and that some of them were told there was no need for them to have an attorney present are insufficient reasons to set aside the releases executed by these claimants under *Lampsis Navigation Ltd. v. Cortes,* where the Second Circuit held:

> [Claimant's] affidavit states, "the company representative said that they were looking out for my interest and that I did not need a lawyer." Assuming that fact to be true for purposes of this motion, it is insufficient to prove that she was induced to forego the assistance of counsel during settlement negotiations and agreed, as a consequence to an unfair settlement .... [A] release and settlement executed by the relatives of a deceased seaman is not inherently unfair simply because it was concluded without benefit of counsel.[24]

Significantly, no attorney who represented a claimant at the settlement has submitted any affidavit or testified that his client was overreached or the sum paid was inadequate.

Claimants have failed to prove misrepresentation or deception. While Santiago did not explain the elements of a cause of action for wrongful death under admiralty law or the measure of damages (as already noted a matter of dispute), this failure falls far short of a willful effort to deceive or mislead. Nor is there any showing of a claimant's incompetence or lack of understanding. While most of them are not well educated, their testimony indicates that they understood that they could pursue a claim against the shipowner in a court of law and that to get the money offered by Santiago they had to sign a document relinquishing such rights.[25] A thorough reading of each claimant's deposition leaves the distinct impression that a number of these claimants were stirred to assert their instant claims by a Dominican attorney and not because of dissatisfaction with the amounts that had been paid to them. Indeed, in one instance the record indicates direct solicitation by the attorney months after the settlement despite the fact that the claimant expressed satisfaction with the settlement.[26] The evidence warrants a finding that each claimant knowingly and without coercion or overreaching accepted the payment offered rather than to commence an action in a foreign forum with its uncertain result.

The Court also finds that the amount paid to each claimant was fair and reasonable under all the circumstances. The Court considers the individual factors bearing on

v. *Lambert and Barr, Inc.,* 539 F.Supp. 282, 293 (W.D.Ark.1982); *Parodi v. American President Lines, Inc.,* 269 F.Supp. 696, 699 (N.D.Cal. 1967).

**23.** The case cited by claimants to support their argument that they were isolated within the control of the shipowner when they signed the releases, *Sagastume v. Lampsis Navigation, Ltd.,* 579 F.2d 222 (2d Cir.1978), is wholly distinguishable. In *Sagastume,* several Honduran seamen had been rescued from a sinking ship

and taken by the shipowner to the United States where they were housed for several days. While in the United States, they signed the releases.

**24.** 694 F.2d 934, 936 (2d Cir.1982), *reh'g en banc denied* (January 21, 1983).

**25.** Cf. *Wright v. United States,* 427 F.Supp. 726, 727 (D.Del.1977).

**26.** Tr. at 494–96; 921.

the fairness of the consideration separately for each set of claimants in the appendix and summarizes several general factors which lead it to conclude that each settlement was fair. First, in almost all of the cases the amount of the settlement, invested at the prevailing interest rate in the Dominican Republic at or about the time of the settlement, would yield a monthly income higher than the monthly earnings of the decedents. Given that the decedents would have retained some money for their own support and maintenance, and in some cases were also supporting other dependents who are not claimants here, the amounts paid are more than fair.[27] In the three cases where the interest income is less than the monthly earnings of a decedent, the consideration is still fair because it more than compensates the claimants for the pecuniary loss, if any.

While the payments made in exchange for the releases may be less than the claimants might have recovered, assuming success in these lawsuits, the settlements are nonetheless fair in view of the substantial and disputed issue of liability[28] and the other uncertain factors bearing on the reasonableness of a claim. A settlement generally contemplates payment of a lesser sum than that which may be recovered only after litigation.

While the Court finds that the amount paid to each claimant at the time of the execution of the general release was fair, another factor emphasizes that petitioner made no attempt to overreach these claimants. Petitioner instructed Santiago to pay all claimants in United States dollars, which were more valuable than Dominican Republic pesos,[29] and he had received from Freehill the funds to make payment in United States dollars. It developed that Santiago was faithless to his trust. He paid all claimants except one in pesos. Thus when

a release provided for payment of $20,000 U.S. dollars, he paid the claimant 20,000 pesos. He pocketed the difference and in two instances shortchanged the claimants by 300 and 500 pesos. Santiago's dereliction did not come to petitioner's attention until September 1982 when the claimants were deposed in the Dominican Republic. Upon investigation, Santiago admitted he had shortchanged the claimants but efforts to obtain restitution failed. Shortly before the trial, Freehill sent to claimants' attorney checks payable to each claimant to make up for the full amount that should have been paid in American dollars as specified in each release, totalling in all $50,-590.55, with a request that the checks be forwarded to each claimant. The attorney did not accept the checks but suggested the disposition be made by court order. Petitioner indicated upon and after the trial that it remained willing to make the additional payment. Since Santiago acted contrary to petitioner's instructions to pay the settlement amounts in U.S. dollars, and petitioner has sought and remains willing to make up the difference, upon the entire record the Court considers that each claimant has received or will receive the amount of U.S. dollars as stated in the release. As previously found upon the facts presented in each individual case, the sum actually received by the claimants at the time of the execution of the release was fair and reasonable; the additional payment to make up for Santiago's dereliction leaves no room to question the fairness of the settlement. The judgment to be entered shall provide that petitioner pay into the Registry of the Court the sums previously tendered for the benefit of each claimant.

In sum, the petitioner has established that the claimants were not overreached in the execution of the settlements. As a

---

**27.** See Lampsis Navigation, Ltd. v. Cortes, 694 F.2d 934, 937 (2d Cir.1982), reh'g en banc denied (January 21, 1983).

**28.** See id.

**29.** Santiago changed the dollars given him by Freehill into pesos at a rate of 1.27 pesos per

dollar. We know the rate which Santiago obtained because one of the claimants, Nelson Jiminez Fernandez, assisted him in changing the dollars into pesos, was present when the transaction was accomplished, and testified as to the rate during his deposition.

result, their claims against Molai, Bradford and Starlight are barred.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Submit decree.

## APPENDIX

General factors bearing on the adequacy of the settlement are as follows: (1) during the relevant time frame, the life expectancy of a Dominican male was 58.40 years and that of a Dominican female was 62.20 years; (2) a twenty percent return on investments was available in the Dominican Republic at or about the time of the payment; (3) the minimum monthly wage in the Dominican Republic is 125 pesos, approximately equivalent to about U.S. $100 at the exchange rate prevailing at the time of the settlement; and (4) the depressed state of the economy in the Dominican Republic, with considerable unemployment.

The Court's discussion of the adequacy of the consideration given to each of the claimants is organized decedent by decedent.

### RAFAEL DAVID BERROA

The claimant with respect to this decedent is Maria de la Cruz Paulino, 26 years of age, the decedent's common law wife, on behalf of herself and her two children by the decedent, Jerry Rafael Paulino and Rafael David Paulino, 2 and 3 years old, respectively, in August 1982. Maria was paid 35,000 pesos in exchange for a release on behalf of herself and her two children, and petitioner has tendered her an additional $7,440.94, the difference between what she was paid and the U.S. $35,000 stated in the release.

Decedent, who was 27 years old when he died, was employed on the Georgios G on August 1, 1980, as an able seaman at U.S. $170 in straight time wages per month and 80 cents per hour overtime. Since decedent's initial voyage on the Georgios G was the one during which the ship was lost, there is no record of his past gross earnings, but his estimated average potential gross monthly earnings were U.S. $222.80. Prior to his employment on the Georgios G, decedent had owned a mechanics shop in Guerra, Dominican Republic, where he earned on the average 300 to 400 pesos per month.

Other than that decedent would spend between 30 and 40 pesos on clothes, there is no evidence of the amounts which decedent expended for other items on himself or for the support of the claimants.

The $35,000 settlement, if invested at the prevailing rate of twenty percent would provide a monthly income of $583.33 to claimants, an amount higher than decedent's highest monthly earnings, without invasion of the principal. The Court finds that the consideration here is fair and reasonable.

### AUGUSTIN CAMPUSANO DIAZ and RAFAEL CAMPUSANO DIAZ

These two decedents were brothers. Rafael was a seaman on the Georgios G, and Augustin was a longshoreman at Rio Haina, who had been working as a ship cleaner on the Georgios G when she was forced to leave port on August 4, 1980. Augustin remained on board when the ship sailed and is the stowaway referred to in the opinion.

The claimants of these decedents are their parents, Justina Diaz Perez, born October 4, 1911, and Furman Campusano, born January 10, 1913. They signed a release for a stated consideration of U.S. $25,000 but were paid 25,000 pesos. Petitioner tendered them U.S. $5,314.96 to make up the difference.

The decedent Augustin was 26 years old when he died, and the decedent Rafael was 18. Neither was married or had any children, but their parents testified that both boys likely would have married and had children and were the kind to have supported their families.

Rafael was first employed on the Georgios G on February 1, 1980, earning U.S. $170 per month in straight time wages and 80 cents per hour overtime. For the five-month period from February 1, 1980 to June 30, 1980, his gross wages were $1,452.94 and from July 1, 1980 to August 5, 1980, his gross wages were $274.20. Before

he became a merchant seaman, Rafael earned 15 pesos per week helping his parents sell food at a roadside stand outside their house. Augustin had also helped his parents sell food for 15 pesos per week until, several years before his death, he became a longshoreman. There is no evidence as to Augustin's earnings as a longshoreman other than his father's deposition testimony that Augustin contributed 340 to 350 pesos per month to the support of his parents. This testimony is not entirely credible because it is inconsistent with the father's answer to an interrogatory, wherein he stated that both brothers each contributed between $15 and $40 per week to the support of their parents before their deaths. This interrogatory answer also conflicts with the father's testimony that Rafael contributed $100 to $150 monthly to his parents' support.

Upon investment, the $25,000 settlement would earn a monthly income of $416.67 for the claimants. The Court deems this to be fair and reasonable compensation in light of the facts that: (1) Rafael's entire monthly salary averaged about $280 (Augustin's wages being unknown); (2) that the two boys undoubtedly would have retained some of their earnings for themselves, and might have married and thus reduce the amount available for support for their parents as in the past; and (3) the parents have already lived beyond their actuarial life expectancies.

## REYNALDO CARDONA ZAPATA

The claimant, Gisella Paulino Echavarria, was born on December 4, 1955. She was not married to decedent but bore him a son, Reynaldo Enrique Cardona, who was 5 years, 9 months old in July 1982. She asserts claims on her own behalf and that of her son. She signed a release for herself and the child for a stated consideration of $20,000, but received 20,000 pesos. Petitioner tendered an additional $4,251.97 to make up the difference.

Decedent was a Colombian citizen who was survived by his wife and three children, residents of Colombia, where his parents also live. Petitioner settled for the decedent's loss with his parents and wife in Colombia on behalf of themselves and the three Colombian children for U.S. $35,000. No member of the Colombian family is a claimant in this action.

Decedent, who was 33 years old when he died, was employed as a merchant seaman since at least January 1978. He joined the Georgios G as a welder on May 1, 1980, and earned $300 in straight time wages per month and $1 per hour overtime. For the two-month period between May 1 and June 30, 1980, decedent earned $980.54 in gross wages. For the period from July 1 to August 5, 1980, he earned gross wages of $413.40.

There is no reliable evidence of the amounts which decedent gave claimant and her son for their support. Claimant testified he gave her 1,200 pesos per month, but this testimony is not credible in light of decedent's earnings and the fact that he was also supporting his wife and three children in Colombia, a fact admitted by claimant. She also conceded that she did not know of any other source of income decedent might have had beyond his earnings on the Georgios G.

Upon investment, the $20,000 settlement would yield a monthly income of $333.33. While this is about $100 less than the decedent's average monthly earnings on the Georgios G, given that decedent would have spent a major part of his income on his Colombian family and likely would also have retained some for himself, the Court finds the consideration given to be fair and reasonable.

## JOSE RAMON JIMENEZ FERNANDEZ

The claimant is decedent's mother, Secundia Fernandez Viuda Jiminez Dina Secon, born on August 24, 1916. Her claim has been asserted by her son, the decedent's older brother, whose name is Nelson Jiminez Fernandez. Nelson, acting by power of attorney, settled his mother's claim for U.S. $20,000; he alone of all the claimants was paid the full amount in dollars and thus there has been no tender of any shortfall.

The decedent, who was 30 years old when he died, was not married and did not have any children. He first joined the Georgios G on June 18, 1980, as an ordinary seaman at U.S. $170 per month in straight time wages and 80 cents per hour overtime. From June 18 to June 30, 1980, his gross wages were $100.26, and from July 1 to August 5, 1980, his gross earnings were $274.20. Prior to his employment on the Georgios G, decedent worked from January 1978 to May 1980 as a plant helper for a fertilizer company in Santo Domingo where he earned 300 to 400 pesos per month. During this time, the decedent lived with his mother and gave her about 200 pesos monthly.

The $20,000 paid to claimant upon investment yields a monthly income of $333.33, which is more than the decedent's monthly earnings on the Georgios G. The Court finds the settlement to be fair and reasonable in light of this fact, as well as the fact that the mother has already outlived her life expectancy.

## JAILAL KISSOON

The claimant is decedent's wife, Melida Mineidis Perez Kissoon, born March 30, 1962, on behalf of herself and her daughter by decedent, Jennifer Kissoon Perez, born some four months after decedent died. Claimant received 19,500 pesos in exchange for signing a release which stated that she had received $20,000. Petitioner tendered $4,645.67 to make up the shortfall.

The decedent, who was a citizen of Guyana, was also survived by his mother, who still lives in Guyana, as well as four children whom the decedent had with a Guyanan woman to whom he was not married. Decedent continued to support his Guyanan mother, his four children and their mother after he met Melida, his Dominican wife, whom he married on March 13, 1979. Petitioner settled for decedent's loss with his mother and the mother of the four Guyanan children on behalf of themselves and the children for 60,000 Guyanan dollars, the equivalent of U.S. $25,000.

The decedent, who was 25 years old when he died, had worked as a merchant seaman since at least January 1978. He was first employed on the Georgios G on March 13, 1980, as an oiler at U.S. $170 per month in straight time wages, increased to $200 on May 1, 1980, with overtime at the rate of 80 cents per hour. For the three-and-one-half month period from March 13 to June 30, 1980, his gross earnings were $1,103.86, and from July 1 to August 5, 1980, his gross earnings were $302.65.

There is insufficient evidence regarding the amount decedent spent on himself, the amount he spent for his mother and family in Guyana, and the amount he spent for claimant's support.

The $20,000 settlement, upon investment, would yield a monthly income of $333.33, which is somewhat higher than the decedent's average monthly salary on the Georgios G. In light of the fact that decedent would have spent a substantial part of his salary for the support of six members of his Guyanan family, the Court finds the settlement to be fair and reasonable.

## ENRIQUE MENDEZ ASCENCIO

The claimant is decedent's father, Cesar William Mendez, either on his own behalf and/or on behalf of the decedent's only child, a daughter named Georgina Rosanni Mendez Natera, born August 10, 1977. The child's mother, Crescencia Natera, to whom decedent was not married, signed a release on her own behalf and on behalf of the child, as did decedent's mother, Francisca Ascencio. The stated consideration in the release is U.S. $35,000. The releasors received 35,000 pesos, and petitioner had tendered them U.S. $7,440.94 to make up the difference. None of the releasors is a claimant here. While the father contends that the mother of the child appointed him to represent the child in this proceeding, the claim previously asserted by her and the release negate this. Moreover, he has submitted no documentary proof of such an appointment. Further, he admits that the child has never lived with him and that he does not support her, although he contends he did support her for a time when the decedent disappeared.

While it is not altogether clear, he also appears to assert a claim on his own behalf. The decedent last lived with his father when the decedent was in elementary school. During high school and since then until his death, the decedent lived with his mother, whom the father did not support. Indeed, the decedent's mother and father never married, and it does not appear that they ever lived together. The father is now married to another woman with whom he has had five children.

The decedent was 23 years old when he died. He first was employed on the Georgios G on February 1, 1980 as a wiper at $170 straight time wages per month and 80 cents per hour overtime. From February 1 to February 29, 1980, his gross wages were $250; from March 1 to March 13, $97; from April 26 to June 30, 1980, $627.53; and from July 1 to August 5, 1980, $267.80. The decedent's only employment prior to his job on the Georgios G was at a textile mill from 1975 to 1976, where he earned 200 pesos per month.

While employed at the textile mill, the decedent helped to support his mother, with whom he lived, but did not contribute any money to the support of his father. The father contends, however, that when the decedent worked on the Georgios G, during which time the decedent continued to live with his mother while in port, the decedent gave the father between $50 and $100 whenever the ship came to the Dominican Republic. This testimony is inconsistent, however, with the father's answer to an interrogatory wherein he stated that the decedent spent about seventy-five percent of his income on himself, the remaining twenty-five percent being insufficient to enable the decedent to make such contributions to his father, particularly since he was also supporting his mother and, presumably, his child.

Assuming arguendo the father has the right to make a claim on behalf of the child, the Court finds that the $35,000 settlement for the child, her mother and her grandmother is fair and reasonable because the interest income on this sum. if invested is $583.33, a good deal more than the decedent's highest monthly wages. To the extent the father is attempting to claim on behalf of himself, the Court finds he has not sustained any pecuniary loss by virtue of his son's death, his son not having lived with him since the son's elementary school days and there being no competent evidence that the son contributed to the father's support.

## JOSE DEL CARMEN MENDEZ TAMAREZ

The claimants are: (1) Juana Maria Familia de los Santos, with whom decedent lived and had two daughters, on behalf of herself and the two girls, Yary Alejandria and Fascelli Maisel, and (2) decedent's parents, Vidal Mendez Contreras and Ana Dolores Tamarez de Mendez, on behalf of two boys, Juan Manuel and Manuel de Jesus, who are decedent's sons by two other women. Juana Maria signed a release on behalf of herself and her two daughters, and Vidal, the father, the same release on behalf of and as grandfather and legal guardian of the two boys. The stated consideration was U.S. $40,000. Juana Maria received 20,000 pesos and Vidal 19,700 pesos. Petitioner tendered $4,251.97 to Juana Maria and $4,488.18 to Vidal and Ana to make up the difference.

Decedent, who was 30 years old when he died, had worked in an ice cream plant for 200 pesos per month from 1971 until sometime in 1980 when he left that job to become a merchant seaman. After leaving the ice cream plant, he sometimes worked on Sundays and other free days as the captain of a small pleasure boat for an unknown amount of pay. The only merchant ship on which decedent ever served was the Georgios G, which he joined on August 1, 1980 as an assistant steward or messboy at U.S. $180 in straight time wages per month and 80 cents per hour overtime. For the five-day period from August 1 through August 5, 1980, decedent's gross wages were $43.45. Multiplying this amount by 6 to approximate decedent's gross wages for a thirty-day period, decedent's monthly earnings on the Georgios G

would have been in the neighborhood of $260.70.

Decedent's mother testified that the decedent had always supported his four children, but there is no evidence as to the amounts which decedent contributed to the support of his children or the other claimants.

The $20,000 settlement apiece to the mother of the decedent's two girls and to his grandparents on behalf of the two boys, if properly invested, yields a monthly income of $333.33 for each set of the claimants, which sum is higher than the decedent's monthly income. The Court thus finds the consideration here to be fair and reasonable.

LUIS MIGUEL DE LEON PICHARDO

The claimant, Faustino Rodolfo Diaz Pichardo, is decedent's older brother, born on February 15, 1934. Claimant signed a release on behalf of himself and decedent's father, who has since died. The release was also signed by a woman with whom the decedent had lived for about a year before he died, one Merkida Venecia Gutierrez Herra. She signed on behalf of herself and her infant daughter, of whom according to the release, the decedent was the adoptive father. Decedent had no children of his own. Neither Merkida nor her child is a claimant in this action. Only the brother challenges the validity of the release. The stated consideration in the release is U.S. $25,000. Santiago paid the releasors 25,000 pesos, of which the brother Faustino kept 13,000 for himself and gave 12,000 to Merkida. Petitioner tendered to claimant and Merkida an additional U.S. $5,314.96 to make up the difference to be divided approximately in the same proportion as previously.

Decedent, who was 32 years old when he died, was employed for about a year as a waiter before he joined the crew of the Georgios G on February 1, 1980, as an assistant steward or messboy, but claimant does not know how much decedent earned in this prior job. Decedent's earnings on the Georgios G were $180 per month in straight time wages and 80 cents per hour

overtime. For the five-month period from February 1 to June 30, 1980, decedent's gross wages were $1,498.70, and from July 1 to August 5, 1980, decedent's gross wages were $298.65.

According to claimant, decedent would give him about U.S. $300 to $400 when decedent returned to the Dominican Republic from voyages on the Georgios G. The Court does not credit this testimony since decedent's total earnings per voyage were between $250 and $300 (a voyage lasted about one month) and in addition to supporting himself, decedent had granted a monthly allotment of $200 to Merkida.

Half of the $25,000 settlement, if properly invested, would yield a monthly income of $208.33. In light of the fact that decedent's monthly income was between $250 and $300, that $200 of this went to Merkida, and that decedent undoubtedly retained some for his own support and maintenance, the amount paid to claimant is more than fair and reasonable. In addition, the amount paid to claimant was on behalf of decedent's father as well as on claimant's own behalf, and the father is no longer alive.

FRANCISCO NICANOR RAMIREZ ESPINOSA

The claimant is decedent's aunt, Maria Altigracia Espinosa V. de Elias, born May 12, 1935. She signed a release on behalf of decedent's father, who later died on December 3, 1981. Also signing the same release was Laura Morena Frias, a woman with whom decedent had one child, a daughter named Anny, who is now 5 to 6 years old. Laura signed on behalf of herself and Anny. The release states that the releasors were paid U.S. $35,000. Santiago paid 30,000 pesos to Laura for herself and Anny and 5,000 pesos to the aunt for the decedent's father. Laura and Anny are not claimants here. Petitioner tendered $7,440.94 to Laura and claimant to make up the shortfall.

Decedent, who was 24 to 25 years old when he died, was first employed on the Georgios G on July 1, 1980, as an able-bod-

ied seaman at $170 per month in straight time wages and 80 cents per hour overtime. From July 1 to August 5, 1980, his gross earnings were $274.20. From 1972 until he joined the crew of the Georgios G, decedent worked painting cars on the street with his friends, for which he received 300 to 400 pesos per car, although there is no evidence as to how many cars he painted during those years.

The aunt testified that during the years when he was painting cars, the decedent and his father lived with her, and the decedent contributed to the support of the household and his invalid father. There is insufficient evidence as to the amount of such support. The aunt also testified that had he lived decedent would likely have married and had more children and would have supported his wife and children.

The Court finds that the 5,000 pesos paid to claimant plus the same proportion of the additional $7,440.94 that she received of the original payment is fair and reasonable consideration in light of the fact that the aunt has not proven any pecuniary loss on her own behalf and the father on whose behalf she claimed when signing the release is no longer alive.