**BOCKENHEIM UNTERWESER REED-EREIBETEILIGUNGS SCHIF-FAHRTSGES, MBH, Plaintiff,**

v.

**M/V VOYAGER and M/V KHUDOZHNIK A. GERASIMOV, their engines, tackle, furniture, etc., in rem, and Barge Transportation Company and Georgian Shipping Company, in personam, Defendants.**

Civ. A. No. 79–1488.

United States District Court, E. D. Louisiana.

July 11, 1980.

J. Dwight LeBlanc, Jr., R. B. Fisher, New Orleans, La., for plaintiff.

Walter Carroll, Jr., Hugh Ramsay Straub, New Orleans, La., MacDonald Deming, New York City, for defendant, counter-claimant and cross-claimant, Georgian Shipping Co.

Francis Emmett, J. Fredrich Kessenich, New Orleans, La., for defendant, Voyager Transportation Co.

CASSIBRY, District Judge:

This litigation involves a collision between the Russian Motorship KHUDOZHNIK A. GERASIMOV (hereafter "KHUDOZHNIK") and the German Motorship BOCKENHEIM, in the Mississippi River near 48 Mile Point (MAHP 142.3). The colliding vessels sued each other for their damages and both colliding vessels asserted claims against the M/V VOYAGER on the ground that the M/V VOYAGER had embarrassed the navigation of the M/S BOCKENHEIM and caused the collision. Prior to trial the M/S KHUDOZHNIK settled her claims with the M/S BOCKENHEIM and dismissed her suit against the M/S BOCKENHEIM and M/V VOYAGER. The claims of the M/S BOCKENHEIM against the M/V VOYAGER were tried upon the pleadings and proof of the M/S BOCKENHEIM and at the close of the M/S BOCKENHEIM's case the court ruled that the M/S BOCKENHEIM had failed to make a showing of right to relief under the facts and the law against the M/V VOYAGER. Judgment was entered accordingly.

## FINDINGS OF FACT

1. At all material times plaintiff, Bockenheim Unterweser Reedereibeteiligungs Schiffahrtsges, MBH, was the owner and operator of the Motorship BOCKENHEIM, a cargo ship approximately 600 feet in length powered by a single diesel engine of 13,300 horsepower which was maneuvered from her wheel house. Her navigation was being controlled by a New Orleans-Baton Rouge Pilots' Association pilot, NOBRA 3.

2. At material times defendant, Barge Transport Company was the charterer of the M/V VOYAGER and the three barges she had in tow, namely the EV, WOLVERINE and JACK. The tow was made up in tandem as a unit and had a total length of 650 feet.

3. At all material times the KHUDOZHNIK was a diesel powered cargo ship approximately 600 feet in length and 70 feet in beam. She was in charge of a pilot from the New Orleans-Baton Rouge Pilots' Association, NOBRA 22, the same pilots' association as was the pilot of the BOCKENHEIM.

4. During the late afternoon of April 24, 1979, the KHUDOZHNIK was proceeding down the Mississippi River and was several miles above 48 Mile Point (MAHP 142.3). At this time, the M/V VOYAGER was pushing her flotilla upriver and was favoring the left descending bank approaching 48 Mile Point. The M/V LEANDER JR., another river pushboat, with one barge in tow was proceeding upriver approximately one mile behind the M/V VOYAGER flotilla and she was also approaching 48 Mile Point. The M/S BOCKENHEIM was then proceeding upriver and was some distance further downriver than the M/V LEANDER JR. proceeding in approximately the middle of the river at full speed ahead (110 rpm).

5. The Mississippi River is approximately 1800 feet in width at 48 Mile Point and above and below the Point it is slightly wider. At this time, the river was in flood stage and the Bonnet Carre Spillway several miles downriver was open which aggravated existing extreme river conditions. When proceeding upriver at 48 Mile Point the river bends sharply to the right at approximately a 60 degree angle. Above and below the Point on the left descending side of the river and in the lower end of the bend on the right descending side of the river there were eddies which extended well out into the river. In the area of the center line of the river, between the eddies, the current was flowing swiftly at a velocity estimated to be from six to eight miles per hour. Boils occurred from time to time in the river in this area due to the turbulent river conditions.

6. The weather was clear, it was daylight, and there was no wind which played any part in the navigation of the vessels involved.

7. Just before the M/V VOYAGER reached 48 Mile Point her navigator called on VHF Radio Channel 13 [1] and said that he

---

1. The radio transmissions between all vessels were monitored and recorded by the Vessel Traffic Service (VTS) and the navigators who made and heard the transmissions had transcriptions available to them before testifying.

did not know if he would be able to make the Point when the eddy affected his tow once it went above the Point. He also advised that he would be in touch if he encountered problems and that he should be watched. The pilot on the BOCKENHEIM acknowledged this transmission which was some 12 or 13 minutes prior to the collision. Nevertheless, he continued at full speed ahead, approximately 10 mph over the ground. Shortly after that transmission the pilot on the BOCKENHEIM advised the pilot on the M/V VOYAGER that the identification of the pilot on the KHUDO-ZHNIK was NOBRA 22. The M/V VOY-AGER's pilot immediately called the pilot on the KHUDOZHNIK and informed him that the tow was not making the Point and that he should watch her. NOBRA 22 instructed the pilot on the M/V VOYAGER not to stop, to go across the river, and that he would go under the stern of the M/V VOYAGER and meet and pass that flotilla on two whistles or starboard-to-starboard. The pilot on the M/V VOYAGER agreed and advised that he would go across the river. The KHUDOZHNIK replied that he had reduced his vessel's speed to dead slow and that he would carry out his part of the agreement to pass starboard-to-starboard. In the meantime, the BOCKENHEIM had continued at full ahead and got closer to the M/V VOYAGER as the VOYAGER moved across the river. The pilot of the BOCK-ENHEIM then made an agreement with the pilot of the KHUDOZHNIK to also meet and pass the KHUDOZHNIK on two whistles or starboard-to-starboard. It was not until this time, approximately five or six minutes prior to collision, that the BOCKENHEIM's engine was ordered half ahead.[2] At the time of the half ahead order, or just before, the BOCKENHEIM altered her course so as to favor the right descending side of the river and headed toward the area in the bend where there were eddies. Approximately four or five minutes before collision the pilot on the

M/V VOYAGER called and said that he was "going over to the trees now" (meaning the right descending bank) and "I appreciate you fellows watching me." Just after that, the pilot on the BOCKENHEIM told the pilot on the KHUDOZHNIK that he believed the KHUDOZHNIK could come on at this time. However, the pilot on the KHUDOZHNIK replied that he was going to give the M/V VOYAGER more time and that he would continue at slow speed. The BOCKENHEIM continued to close with the M/V VOYAGER and her pilot claims that he first gave ten degrees right rudder to move out river and clear the stern of the M/V VOYAGER on the M/V VOYAGER's starboard side. He claims further that a boil welled up in the river beneath the M/V VOYAGER flotilla causing the M/V VOY-AGER to lose headway as she moved across the river. He then asked the pilot of the M/V VOYAGER to turn his rudder hard right, which the M/V VOYAGER did. The pilot on the BOCKENHEIM also gave hard right rudder and cleared the stern of the M/V VOYAGER. Shortly thereafter, hard left rudder was applied to the BOCKEN-HEIM. She did not respond and turned to starboard at almost a ninety degree angle. Her bow headed for the left descending bank at 48 Mile Point. The pilot on the BOCKENHEIM then requested the pilot on the KHUDOZHNIK to change the starboard-to-starboard passing agreement to one of port-to-port and, in effect, to pass between the M/V VOYAGER and the BOCKENHEIM. The pilot on the KHU-DOZHNIK replied that this would be impossible. Plaintiff's expert, Captain Richard E. Walton, a member of the Crescent River Port Pilot Association for 23 years, and the pilot on the KHUDOZHNIK were of the opinion that the BOCKENHEIM went out of control and her rudder was ineffective because her stern was caught in the eddy in the bend which pushed the stern upriver and that her bow was caught in the

---

2. The recording tape on the bridge telegraph shows that propeller revolutions were only reduced to 98 which is only a relatively slight reduction from full ahead (110 rpm).

swift downriver current which was pushing the bow downriver. There were also opinions expressed that the BOCKENHEIM could probably have continued her right-hand swing, and turned completely around in the river and headed downriver without mishap. Nevertheless, the BOCKENHEIM continued at half ahead until she was almost aground on the left descending bank at 48 Mile Point, at which time she went full speed astern. The KHUDOZHNIK sounded the danger signal and backed but nevertheless her bow struck the port side of the BOCKENHEIM in the midship's area inflicting heavy damage to the BOCKENHEIM.

8. The collision occurred at approximately 1648 hours on April 24, 1979 at 48 Mile Point some 300 feet off the Point when the bow of the BOCKENHEIM was aground.

9. At all times until the BOCKENHEIM went out of control, the M/V VOYAGER flotilla and the KHUDOZHNIK were ascending and descending vessels meeting one another. The BOCKENHEIM was an overtaking vessel insofar as the M/V VOYAGER flotilla was concerned and her obligation with respect to the KHUDOZHNIK was one of ascending and descending vessels.

10. At no time was there an agreement by radio or by means of whistle signals for the BOCKENHEIM to overtake and pass the M/V VOYAGER flotilla.

11. The BOCKENHEIM, as a vessel stemming the current, should have had good control of her steering and speed and she had the ability to stop and stay well clear of the M/V VOYAGER until her pilot placed her stern in the eddy in the bend and her bow in the current. Turning under these circumstances caused the BOCKENHEIM to lose control and this was the sole proximate cause of the collision. If she had stayed behind the M/V VOYAGER at a safe distance by reducing her speed, stopping or reversing, this collision never would have occurred.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of this action and venue is properly laid in the Eastern District of Louisiana. 28 U.S.C. § 1333.

2. The collision between the M/S BOCKENHEIM and M/S KHUDOZHNIK was caused by the sole fault of the BOCKENHEIM whose faults were gross and inexcusable.

3. The navigation of the vessels involved, i. e. M/S BOCKENHEIM, M/S KHUDOZHNIK and M/V VOYAGER was governed by the Pilot Rules for the Western Rivers. 33 U.S.C. § 301 et seq.

4. In accordance with Rule 18 of the Pilot Rules for the Western Rivers, KHUDOZHNIK, as the descending vessel, had the right-of-way with respect to the ascending VOYAGER and BOCKENHEIM. As such, the KHUDOZHNIK had the right to decide how the ascending vessels would meet and pass her. The VOYAGER flotilla followed the instructions of KHUDOZHNIK and successfully made a starboard-to-starboard passing which had been ordered by her. 33 U.S.C. § 343.

5. The BOCKENHEIM was at fault in failing to carry out the agreed starboard-to-starboard meeting and passing arrangement with KHUDOZHNIK because she lost control due to current and eddy conditions which were well known to her experienced navigator and which he should have foreseen. *Christie & Lowe v. Fane S.S. Co.*, 159 F. 648 (5th Cir. 1908).

6. The BOCKENHEIM was at fault for failing to timely slacken her speed or, if necessary, stop and reverse so as not to involve risk of collision with the M/V VOYAGER. 33 U.S.C. § 346; Pilot Rules for the Western Rivers, Rule 21. The BOCKENHEIM created a risk of collision by continuing to close and overtake the VOYAGER at excessive speed. The pilot aboard VOYAGER had warned the BOCKENHEIM by radio as much as 12 to 13 minutes prior to collision that she might have difficulty negotiating 48 Mile Point and that she should be watched closely. The VOYAGER continued to apprise BOCKENHEIM of her

progress as she crossed the river. The navigator of the BOCKENHEIM was well aware of adverse river conditions and that an unexpected boil might cause the M/V VOYAGER flotilla to stall. Nevertheless, the BOCKENHEIM continued ahead at excessive speed causing the risk of collision which ensued both with VOYAGER and KHUDOZHNIK.

7. With respect to the VOYAGER, the BOCKENHEIM was in the position of an overtaking vessel. As such, the movement of the two vessels was governed by Rule 22 of the Pilot Rules for the Western Rivers, 33 U.S.C. § 347.

8. The BOCKENHEIM had no agreement with the VOYAGER by radio or whistle signal to overtake and pass the VOYAGER flotilla. Under the circumstances, the BOCKENHEIM's maneuvers were improper and ill-advised. The BOCKENHEIM was at fault for violating Rule 22 of the Pilot Rules for the Western Rivers, 33 U.S.C. § 347.

9. It was the duty of the BOCKENHEIM, as the overtaking vessel, to keep out of the way of the VOYAGER, the overtaken vessel. *B. F. Diamond v. M/V Fernside*, 252 F.2d 381 (5th Cir. 1958); *Pure Oil Co. v. M/V T. M. Norsworthy*, 182 F.Supp. 365 (E.D.La.1959); 33 U.S.C. § 347.

10. The leading vessel is under no obligation to keep out of the way. The overtaking vessel must give the one ahead such wide berth as to avoid any contingencies that might arise such as sheering by the vessel ahead caused by suction, current, or tide. The overtaking vessel takes the risk of necessary alteration of course or checking of speed by the leading vessel to avoid a third vessel or stopping to let another vessel pass. *Whitridge v. Dill*, 23 How. 448, 16 L.Ed. 581 (1860); *The George A. Hoyt*, 8 F. 845 (D.C.N.Y.1881); *The Sylvan Grove*, 29 F. 336 (E.D.N.Y.1886); *The Hackensack*, 32 F. 800 (E.D.N.Y.1887); *The Whiteash*, 64 F. 893 (S.D.N.Y.1894); *The Fred Jansen*, 49 F. 254 (2nd Cir. 1892); *The City of Macon*, 51 F. 949 (5th Cir. 1892). By his own admissions, the navigator of the BOCKENHEIM failed to do this.

11. Not only must the overtaking vessel keep out of the way of the leading vessel but, as here, in the absence of a signal or agreement, the leading vessel may change her course at any time and is under no duty with respect to vessels astern. *Liner v. Crewboat Mr. Lucky*, 275 F.Supp. 230 (E.D.La.1967); *The M.J. Rudolph*, 292 F. 740 (2nd Cir. 1923). If an overtaking vessel, without proper signals, comes so close to the leading vessel that a sudden change of course by the latter may bring about a collision, the fault is that of the overtaking vessel.

12. Further, the BOCKENHEIM was at fault in attempting to pass the VOYAGER at an unsafe speed, at an unsuitable place in the river, and while the VOYAGER was engaged in meeting and passing KHUDOZHNIK. *Pure Oil v. M/V T. M. Norsworthy* (supra), *The Clement Smith*, 9 F.2d 174 (E.D.La.1925).

13. Accordingly, the M/V VOYAGER, as a matter of law, violated none of the Rules of the Road applicable. The sole proximate cause of this collision stems from the statutory faults of the BOCKENHEIM and her improper navigation under circumstances that were well known to her navigators. *The Pennsylvania*, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1874).

14. Now therefore let these Findings of Fact and Conclusions of Law be rendered in accordance with the Judgment rendered herein in these proceedings on the 23rd day of April, 1980, against plaintiff, Bockenheim Uterweser Reederei-Beteiligungs Schiffahrtsges, dismissing plaintiff's suit under Rule 41(b) FRCP, with costs.