In the Matter of the Petition of SLOBOD-NA PLOVIDBA, an agency of the Government of Yugoslavia, as owners of the M/V JABLANICA for Exoneration from or Limitation of Liability, Plaintiff,

v.

Cathy S. KING, Personal Representative of the Estate of Russell King, Deceased; Dorothy M. Perkins, Personal Representative of the Estate of Edward M. Perkins, Deceased; and Marlene K. Peterson, Personal Representative of the Estate of Kirk Peterson, Deceased, Defendants.

No. M86–209 CA 3.

United States District Court,
W.D. Michigan, N.D.

June 7, 1988.

As Corrected June 20, 1988.

Leonard C. Jaques of The Jaques Admiralty Law Firm, P.C., Detroit, Mich., for plaintiff.

William M. Kimball, New York City, and Robert N. Dunn, Tribler and Marwedel, Chicago, Ill., for defendants.

## OPINION

HILLMAN, Chief Judge.

On August 20, 1986, at approximately 11:21 (Eastern Daylight Time), a collision occurred on northern Lake Michigan between the vessels Jablanica and the Razal Brothers. The Razal Brothers, a fishing boat, capsized and sank. Its three occupants drowned. There were no injuries aboard the Jablanica.

On August 25, 1986, petitioner, Slobodna Plovidba, an agency of the Government of Yugoslavia and the owner of the Jablanica, filed a petition pursuant to 46 U.S.C.App. § 181 *et seq.* seeking exoneration from and limitation of liability for the sinking of the Razal Brothers and the deaths of its captain and crew. Cathy King, Dorothy Perkins, and Marlene Peterson, as the personal representatives of the estates of the three drowned fishermen (claimants), filed claims

against petitioner on December 29, 1986. On September 1, 1987, petitioner filed counterclaims against claimants. Claimants subsequently filed a motion to dismiss petitioner's counterclaims pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.

On March 17, 1988, I filed an opinion and order granting the motion with respect to crewmen King and Peterson, and granting it in part and denying it in part as it pertained to Captain Perkins.

A two and one-half day bench trial on the remaining negligence claims commenced on March 28, 1988. The court heard eight witnesses and admitted eleven exhibits.

The testimony of the witnesses was largely on the subject of damages. The evidence relating to the collision itself came almost exclusively from the exhibits, specifically: the depositions of Captain Seman and Third Mate Emil Grubelic of the Jablanica; a Coast Guard interview of the Jablanica's pilot Kenneth Gumtow; the Coast Guard Report dated January 20, 1987; and the findings of fact from the decision and order entered by an administrative law judge following a hearing on the possible revocation of Pilot Gumtow's license. The conclusions of law of the administrative law judge were not offered nor made available in any way to the court.

With the exception of some pertinent background information provided by the families of the deceased seamen, I have relied almost entirely on the Coast Guard Report and the depositions of Pilot Gumtow and Captain Seman in making my findings of fact. I have given little weight to the deposition of the third mate as it is, as a result of language barriers, almost unintelligible. I have also given no weight to the administrative law judge's findings of fact. Submitted by petitioner, the findings are based largely on an "agreed statement of fact" which, although referred to, is neither incorporated into the findings nor attached to them. Thus, the findings are meaningless to the court. In contrast, the Coast Guard Report makes no reference to any unattached "agreed facts." Furthermore, it contains no conclusions of fault or

blame. Therefore, I have given it significant weight.

The court's admiralty jurisdiction, which is based on 28 U.S.C. § 1331, is uncontested. Having heard the evidence, studied the exhibits, and listened to arguments of counsel, the following constitute the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

## I. *Findings of Fact*

The decedents, Edward Perkins, Russell King, and Kirk Peterson were commercial fishermen licensed in the state of Michigan to undertake gill-net fishing on the Great Lakes. Perkins and King both lived in Naubinway, Michigan, a small fishing community near Manistique. Peterson lived with his parents in Manistique.

Captain Perkins, who was 46 years old at the time of the collision, married claimant Dorothy Perkins on July 13, 1975. Perkins had one son, Matthew, born in 1968. In addition, Dorothy had three children from a previous marriage. Two of the Perkins' four children were living with them at the time of the accident. Perkins was a third generation gill-net fisherman. However, his experience on the Great Lakes was not limited to fishing. Prior to becoming a full-time fisherman, he worked as a tug captain for Capital Dredging.

Russell King was 31 years old when he died. He and his wife, claimant Cathy King, were the parents of two children, Bobby Jo, now 13, and Greg, now nearly 10. King's first adult experience with fishing was as a "fisherman's helper" for Perkins who, at the time, operated a fishing business with another individual. Prior to working for Perkins, King was employed at a tool and die plant near Detroit and by an excavating company owned by his father-in-law. He also worked for the Mackinac County Road Commission for a time.

In 1983, Perkins and King decided to go into the fishing business together. They formed "E & R Fisheries, Inc." Through this corporation they purchased their boat, the "Razal Brothers." Each was a 50 percent owner of the corporation. According

to the testimony at trial, Perkins and King had a good working and personal relationship. Generally they hired between one and four fisherman's helpers to work with them on their boat. Sometimes they docked the Razal Brothers at Naubinway and sometimes at Manistique. When they docked at Naubinway, the men generally left home by 6:00 a.m. When they docked the vessel in Manistique, they began their day several hours earlier. On the morning of the accident, they set out from Manistique to lift and reset their nets. Perkins and King had one fisherman's helper with them, Kirk Peterson.

Twenty-seven-year-old Peterson was unmarried at the time of his death. After completing high school, he did a hitch in the Navy. He then worked for a commercial fisherman in Ludington. In the spring of 1986 he returned to Manistique, where his parents lived, and began working for Perkins and King.

The Razal Brothers typified vessels used for gill-net fishing on the Great Lakes. Built in 1949, the vessel was approximately 39 feet long. Its gross weight was 20 tons. An enclosed deck house covered its full length to facilitate year around fishing. On the port side, the Razal Brothers had two doors, one about one-third and one about two-thirds of the vessel's length aft of the stem. A porthole was located approximately mid-ship on the port side. On the starboard side there were no doors or portholes located on the forward half of the ship. However, there was a porthole mid-ship and the door that mirrored the door on the port side. The pilot house was located aft and was raised approximately eighteen inches. The steering station was located in the port forward corner of the raised area. There was a porthole at the steering station. A mirror image porthole was located on the starboard side of the raised area. Three rectangular areas provided forward vision from the raised area. A large door in the transom allowed aft vision. There was a porthole in that door. The Razal Brothers carried a VHF radio, radar, an auto-pilot mechanism, two fathometers, two Loran C receivers, and a magnetic compass. The auto-pilot used an independent magnet to maintain the desired course. A mechanical clutch located below the helm engaged and disengaged the auto-pilot mechanism from the normal steering mechanism.

The Jablanica is typical of modern, dry-bulk cargo vessels. Its superstructure is all aft. Built in 1979 in Split, Yugoslavia, it is approximately 622 feet in length and weighs 17,996 gross tons. Its bow is conventional and the stem is plumb from the baseline to a height of approximately 36 feet. Above that point, the stem has a mild forward rake.

Throughout the period in question the Jablanica was manned by a licensed Yugoslavian crew. Captain Franko Seman took command of the ship on July 12, 1986, in Greece. The Jablanica subsequently traveled to France where it picked up a load of steel coils to be delivered to the ports of Detroit, Chicago, and Duluth. The ship was to be loaded with a cargo of grain in Duluth for shipment to Tunisia.

During the period the Jablanica was on the Great Lakes, the ship was required to have on board a pilot registered in the United States or Canada pursuant to 46 U.S.C. 9302. In keeping with this statute, Pilot Kenneth Gumtow boarded the Jablanica when it first entered the jurisdiction of the Upper Great Lakes Pilots Association several days before the accident. Gumtow holds Coast Guard pilot license number 541829. During his time on the ship, Gumtow experienced no difficulty in communicating with the ship's officers. Neither did he experience any problem with the ship or its equipment.

Following the collision on August 21, 1986, Federal Coast Guard personnel from the office of the Captain of the Port in Saulte Ste. Marie boarded the ship and found her to be in compliance with all applicable navigation safety regulations, including the posting of vessel maneuvering characteristics.

On the morning of August 20, 1986, the Razal Brothers, with decedents Perkins, King, and Peterson aboard, departed the docks at Manistique, Michigan. It was the

fishermen's intent to lift and set gill nets. The weather was clear, visibility was approximately twenty statute miles, and Lake Michigan was relatively calm with two to three foot waves.

After lifting 12,000 feet of net southwest of Seul Choix Point, a protrusion of land east of Manistique on the southern shore of Michigan's Upper Peninsula, the Razal Brothers set out in an easterly direction heading roughly toward the Straights of Mackinac. At 9:50 a.m., Captain Perkins called the J.R. Jensen, another fishing vessel. (All times throughout this opinion are Eastern Daylight Time.) The operator of the Jensen answered the Razal Brothers on channel 16. The fishermen subsequently switched to channels 68 and then 70 to complete their conversation.

At 10:30 a.m., the crew of the Jensen saw the Razal Brothers pass nearby. All three crewmen on the Razal Brothers were working on the forward part of the ship. All doors on the Razal Brothers were open. The operator of the Jensen estimates that the Razal Brothers was traveling at a speed of ten miles per hour.

At 11:04 a.m., Captain Perkins again called the Jensen. He stated that the Razal Brothers was headed for a point northwest of Whiskey Island. Captain Perkins did not describe the activities of his crew at that time.

Throughout the morning of August 20, the fishermen aboard the Jensen periodically observed the Jablanica by sight and radar. The crew of the Jensen observed the vessel to be moving generally to the north and east. It appeared to be upbound moving towards the Straits of Mackinac in an area frequently used by deep draft traffic on Lake Michigan. At approximately 11:30 a.m., immediately following the accident, the Jablanica was observed by the Jensen crew to be moving in a westerly direction. The operator of the Jensen remarked to one of his crew that the new direction of the ship indicated that something was out of the ordinary.

On August 19, 1986, the Jablanica left Chicago for Duluth via the Straights of Mackinac. Due to the relatively small amount of cargo on board (1500 tons of steel coil) the vessel was in ballast condition. After leaving the harbor, the ship's crew brought the ship up to its normal sea speed of 13.5 knots. Pilot Gumtow laid out a track line on Chart No. 14902. The line generally followed the recommended courses established by the Lake Carriers Association and Dominion Marine Association. This would take the Jablanica across Lake Michigan in a north, northeasterly direction from Chicago to near Beaver Island which is close to the east shoreline of Lake Michigan near Charlevoix, Michigan.

Gumtow also made the notation "call pilot" on the chart approximately eight miles southwest of Boulder Reef. Boulder Reef is located approximately seventeen miles west of the southern end of Beaver Island. After dinner on August 19, Captain Seman and Pilot Gumtow had one or two beers. No other alcohol or drugs (prescription or non-prescription) were consumed through the period of the collision. Both men obtained a full night's sleep as the ship headed up Lake Michigan.

On the morning of August 20, 1986, at approximately 9:40 a.m., the Jablanica was about eight miles southwest of Boulder Reef. A crew member called Pilot Gumtow to the bridge. The ship, which had been placed on automatic pilot, was set on a course of 015 degrees true and at a speed of 15.4 miles per hour. The third mate was on watch along with one other seaman. The third mate was acting as lookout and plotting fixes. The seaman was performing routine housecleaning duties. The captain was on the bridge, but he was not actively involved in navigation.

At approximately 10:00 a.m., opposite Boulder Reef, Pilot Gumtow directed the third mate to change course to 041 degrees true. The third mate adjusted the auto-pilot and, resuming his lookout duties, took fixes by sight and radar plot the Jablanica's progress on the chart.

At approximately 10:30 Pilot Gumtow, Captain Seman, and the third mate sighted the Razal Brothers. The captain observed the smaller ship on radar. It was traveling in the same direction as the Jablanica on

what the Jablanica personnel believed was a parallel course nine to ten miles away bearing 45 degrees off the Jablanica's port bow. No one on the Jablanica plotted the Razal Brothers true course, but all three men periodically checked the vessel judging its course by bearing change and "seaman's eye."

Opposite Gull Island, which is northeast of Boulder Reef and approximately 10 miles west of Beaver Island, at about 10:45 a.m., the pilot told the third mate to bring the Jablanica from 041 degrees true to 053 degrees. The third mate swung the ship to starboard and reset the automatic pilot. During the next 35 minutes the course of the Jablanica was adjusted twice to keep it on the intended track, first to 055 degrees true and then to 057 degrees.

As Gumtow, Seman, and the third mate continued to observe the Razal Brothers they determined that while the smaller boat was traveling on a course parallel to the Jablanica, it had a slow bearing drift to starboard. As a result, the range between the two boats was closing. It thus became apparent that the paths of the vessels would cross. However, neither the pilot nor the captain believed the two vessels were on a collision course.

At some time near 11:00 a.m., the bridge personnel on the Jablanica observed that the starboard and stern doors on the Razal Brothers were open, but they could see no crewmen. Pilot Gumtow attempted to contact the Razal Brothers on the ship's VHF radio at approximately 11:05 a.m., 11:10 a.m., and 11:15 a.m., but to no avail. The pilot states that he used channel 16. The captain and third mate confirmed that the pilot attempted to call the Razal Brothers two or three times. Two other vessels in the area that were monitoring channel 16 did not pick up the calls. Neither does the Coast Guard record of radio traffic in the area reflect a call from the Jablanica on channel 16. However, the Coast Guard Report notes that the traffic was heavy on channel 16 and operators were drowning out one another's calls.

Sometime between 11:00 a.m. and 11:15 a.m. the third mate on the Jablanica switched off the automatic pilot and assumed the duties of helmsman. About 11:19 a.m., when the Razal Brothers was approximately 500 yards from the Jablanica and bearing 30 to 35 degrees off the large ship's port bow, Pilot Gumtow ordered a single "long" blast of approximately ten seconds on the ship's whistle. The blast was intended to attract the attention of those aboard the Razal Brothers and inform them that the Jablanica was passing on the starboard side. The small vessel did not respond.

Up through this time neither the captain nor the pilot had anticipated or feared a collision. Following the blast, however, Captain Seman and Pilot Gumtow observed a change in the Razal Brothers' course. While maintaining speed, it was executing a substantial turn to the starboard. In less than two minutes the Razal Brothers' course had changed so that it was heading nearly perpendicularly into the bow of the Jablanica. In response, at approximately 11:21 a.m., Pilot Gumtow sounded a danger signal (six short blasts on the ship's whistle). The Razal Brothers did not respond but continued bearing hard to starboard. As the danger signals were blasted, Pilot Gumtow and Captain Seman simultaneously ordered the third mate at the helm of the Jablanica to turn hard to starboard and the captain ordered the engine stopped. Within seconds the assistant engineer on watch in the engine room responded that the engines had been cut and the ship's head began to swing to the starboard. While maintaining its speed of eight to ten knots, the Razal Brothers inexplicably continued to swing to starboard. As the Razal Brothers approached the Jablanica, it was blocked from the sight of Captain Seman, Pilot Gumtow, and the third mate by the edge of the larger ship. At that point, it was heading almost perpendicular into the Jablanica's bow.

No one on the Jablanica felt or heard a collision. The captain and pilot ran to the starboard side hoping to see that the small boat had cleared the Jablanica. They saw no sign of the Razal Brothers. The pilot returned to the port side and again saw

nothing. A seaman working on the forward deck during the time of the collision felt and heard nothing. He also looked over the starboard side expecting to see the Razal Brothers.

The captain and pilot finally spotted a few pieces of debris on the port side of the Jablanica. The captain ordered hard left rudder. The ship began to turn to port and, under the direction of the captain, undertook search and rescue procedures. Pilot Gumtow initiated contact with the St. Ignace Coast Guard station. The life boat was readied for launching and as Captain Seman watched the area where debris had been spotted, he saw a man in the water. The man in the water was reported to be moving and thought to be alive. A lifeboat was immediately lowered and its crew pulled fisherman Peterson on board and began efforts to revive him. Those efforts were unsuccessful.

Two HH–3 helicopters from the Coast Guard Station in Traverse City joined the rescue. One of them soon returned to Manistique for refueling. The other airlifted Peterson to Schoolcraft Memorial Hospital in Manistique where he was pronounced dead on arrival.

Throughout the afternoon and early evening the Jablanica's lifeboat, two HH–3s, a 44 foot boat from St. Ignace, and a Michigan Department of Natural Resources research vessel continued rescue efforts. Captain Perkins and Crewman King were not found. The Charlevoix County Sheriff eventually took responsibility for the search. King's body was recovered on August 26 and Perkins' on September 4.

In order to completely and accurately document the condition of the sunken Razal Brothers, the Coast Guard hired a civilian firm to videotape the boat in September and October of 1986. One of the involved parties also hired a diver who, in December, recovered the auto-pilot, radar, fathometer, and the Loran C receiver from the Razal Brothers. Based on information obtained from these sources, I am satisfied that the three crewmen of the Razal Brothers, following the common practice of gillnet fishermen on Lake Michigan, had put the boat on automatic pilot and were below deck cleaning fish at the time of the accident. In particular, I have reached this conclusion from evidence that just prior to collision no one on the Jablanica observed anyone on the deck of the Razal Brothers; that the gear shift was found in neutral; that the auto-pilot was engaged; and that numerous gutted fish were found below deck.

The Coast Guard Report also reflects the consensus among technicians, and at least one manufacturer, that the magnet in auto pilots can be affected significantly by large iron and steel objects. The admiralty treatises are also replete with warnings of the unwanted influence of tools, portable radios, and even beer cans on the magnets in automatic pilots. *See e.g.*, C. Chapman, *Piloting, Seamanship, and Small Boat Handling* 551 (56 ed. 1983); R. Farwell, *Rules of the Nautical Road,* 355 (6th ed. 1962). In light of this information, I am satisfied that it is likely that the unexpected, unexplained, last minute, nearly 90 degree turn of the Razal Brothers into the Jablanica was caused by the attraction of the magnet in its auto-pilot to the Jablanica. However, it should be noted that at trial no testimony, expert or otherwise, was offered regarding this hypothesis.

## II. *Discussion*

In determining whether a ship owner is entitled to exoneration from or limitation of liability for a collision, a claimant, be it an injured crew member or the representative of a deceased crew member, has the initial burden of proving that the ship owned by petitioner was unseaworthy or navigated in a negligent manner, and that that unseaworthiness or negligence caused the accident. *Complaint of Molai Shipping Corp.,* 569 F.Supp. 523, 524 (S.D.N.Y.1983). *See also, Self v. Great Lakes Dredge & Dock Co.,* 832 F.2d 1540, 1557 (11th Cir. 1987). In this case, the parties have agreed that the seaworthiness of the vessels is not at issue. The negligence alleged both by claimants and petitioner relates only to the operation of the Jablanica and the Razal Brothers.

Under the Rule first enunciated in *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 135, 22 L.Ed. 148 (1873), if a claimant can prove that the petitioner's ship was in violation of a statutory Rule designed to prevent collisions, the burden shifts to the petitioner to prove that that violation was not a cause of the collision. *Self,* 832 F.2d at 1554–55. However, if the petitioner cannot prove that its statutory negligence was not a cause of the accident, it may nevertheless exonerate itself by proving that its officers and managing agents were not privy to and had no knowledge of the negligent act. *Molai,* 569 F.Supp. at 524–25.

In the instant case, no need exists to reach the latter step as I am satisfied that while the Jablanica was in technical violation of at least one statutory Rule designed to minimize collisions, this violation was not a proximate cause of the collision.

Claimants allege that the Jablanica's crew violated rules 7, 16, and 34 of the Inland Navigational Rules, 33 U.S.C. § 2007; 33 U.S.C. § 2016; 33 U.S.C. § 2034. Rule 7, governing how vessels are to assess the risk of a collision, states:

(a) Determination if risk exists

Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

(b) Radar

Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

(c) Scanty information

Assumptions shall not be made on the basis of scanty information, especially scanty radar information.

(d) Considerations taken into account in determining if risk exists

In determining if risk of collision exists the following considerations shall be among those taken into account:

(i) such risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change; and

(ii) such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

Rule 16 provides that "[e]very vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear."

Rule 34, prescribing maneuvering and warning signals, states in pertinent part:

(a) Whistle signals

When power-driven vessels are in sight of one another and meeting or crossing at a distance within half a mile of each other, each vessel underway, when maneuvering as authorized or required by these Rules:

(i) shall indicate that maneuver by the following signals on her whistle: one short blast to mean "I intend to leave you on my port side"; two short blasts to mean "I intend to leave you on my starboard side"; and three short blasts to mean "I am operating astern propulsion".

(ii) upon hearing the one or two blast signal of the other shall, if in agreement, sound the same whistle signal and take the steps necessary to effect a safe passing. If, however, from any cause, the vessel doubts the safety of the proposed maneuver, she shall sound the danger signal specified in paragraph (d) of this Rule and each vessel shall take appropriate precautionary action until a safe passing agreement is made.

.        .        .        .        .

(c) Overtaking situations

When in sight of one another:

(i) a power-driven vessel intending to overtake another power-driven vessel shall indicate her intention by the following signals on her whistle: one short blast to mean "I intend to overtake you on your starboard side"; two short blasts to mean "I intend to overtake you on your port side"; and

(ii) the power-driven vessel about to be overtaken shall, if in agreement, sound a similar sound signal. If in doubt she shall sound the danger signal prescribed in paragraph (d).

(d) Doubts or failure to understand signals

When vessels in sight of one another are approaching each other and from any cause either vessel fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle. This signal may be supplemented by a light signal of at least five short and rapid flashes.

Petitioner responds that the sole proximate cause of the accident was the unexpected starboard turn of the Razal Brothers into the Jablanica's path after the Jablanica's pilot sounded a passing signal. Specifically, petitioner cites the failure of the crew of the Razal Brothers to maintain a proper lookout by sight and sound in accordance with Rule 5, 33 U.S.C. § 2005, and the crew's failure to maintain the Razal Brothers' speed and course in accordance with Rule 17, 33 U.S.C. § 2017.

In examining both the claimants' and the petitioner's allegations, it is important to keep in mind certain basic rules of admiralty law. First, it is generally accepted in admiralty, as well as in tort law, that an act, though negligent, will not be held to be the proximate cause of an injury when, but for the intervening negligence of another, no injury would have taken place. *Long Island R. Co. v. Killien,* 67 Fed. 365, 368 (2d Cir.1895); *Albatross Tanker v. S.S. Amoco Delaware,* 415 F.2d 692, 695 (2d Cir.1969). Second, negligence will not attach to the navigator of a ship unless he or she makes a decision which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances of the accident. *Dalldorf v. Higgerson–Buchanan, Inc.,* 402 F.2d 419, 423 (4th Cir.1968). Similarly, in assigning fault for a collision, the trial judge is to assess the navigation of the vessels in light of the circumstances as they appeared at the time and not as they appear to one looking back from a later date. *Esso Standard Oil, S.A. v. S.S. Gasbras Sul,* 387 F.2d 573, 582 (2d Cir.), *cert. denied,* 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968).

Assessing the facts and legal claims in light of both these principles and the case law interpreting the applicable navigational rules, I am satisfied that the sole cause of the collision was the abrupt and unforeseeable turn of the Razal Brothers into the Jablanica's path. I am satisfied that had the fishermen maintained an appropriate lookout, either by sight or sound, the Razal Brothers would not have been left on automatic pilot. Consequently, the boat would not have been without a pilot and would not have turned mindlessly into the bow of the Jablanica. Given the range and bearing of the Razal Brothers in relation to the Jablanica just prior to its starboard, I am satisfied had the smaller boat maintained its range and speed, the Jablanica would have overtaken it without incident.

Claimants argue that in violation of its duty under Rule 16, the Jablanica did not take "early and substantial" action to avoid collision with the Razal Brothers. It is uncontroverted that the Jablanica was attempting to overtake the Razal Brothers on the smaller ship's starboard side. Thus the Jablanica, as the overtaking or give-way vessel, also had a duty under Rule 13 to keep out of the way of the Razal Brothers, the overtaken or stand-on vessel. Certainly, in applying Rule 16 to any passing situation which results in an accident, one could argue that had the overtaking vessel acted earlier or differently, or in fact not even been in the water, the collision could have been avoided. However, such a standard would impose strict liability on the give-way vessel. Such is not the intent of the rules. This is clearly indicated by the fact that Rule 17 imposes a duty on the stand-on vessel to "keep her course and speed" when being overtaken or passed.

Accepting then, that the give-way vessel is not strictly liable for all collisions, the limits of its duties can best be defined by looking to the case law interpreting Rule 13. While several cases cited and interpreted precursors of Rule 16, they are over a century old, pertaining to sailing vessels, and dealing with head-on crossings rather than passing or overtaking actions. Thus, they are not particularly apt. In contrast, Rule 13, which specifically addresses the duty of a give-way vessel in an overtaking situation, has more often and more recently been the subject of judicial scrutiny.

Case law interpreting Rule 13 is clear that while the give-way vessel (the Jablanica in this case) is required to "keep out of the way" of the overtaken or stand-on vessel (the Razal Brothers), it is not required to keep out of the way so as to avoid a collision no matter what unexpected or improper maneuver the stand-on vessel makes. *Long Island R. Co. v. Killien*, 67 Fed. 365, 368 (2d Cir.1895); *Williams–McWilliams Industries, Inc. v. F & S Boat Corporation*, 286 F.Supp. 638, 642 (E.D.La. 1968); *The Pilar De Larrinaga*, 42 F.Supp. 648, 654 (E.D.Pa.1942).

In *Williams–McWilliams Industries*, the stand-on vessel executed an unexpected maneuver in a canal. After signaling her assent to being overtaken, the stand-on vessel moved to the starboard to ensure safe passage of two overtaking vessels on the port side. As the first overtaking vessel moved by her, the stand-on vessel grounded on the starboard bank of the canal. As a result, her tow "topped around," almost completely reversed direction, and came to rest against her port side. The second overtaking vessel, on seeing that the stand-on vessel was in distress, sounded the danger signal and moved toward the port side of the channel. As a result of her crew's efforts, the stand-on vessel drifted downstream and collided with the overtaking vessel. The court held that while the overtaking vessel had assumed the risks inherent in passing, and was obliged to guard against foreseeable and normal maneuvers of the overtaken vessel, she did not assume the risk of the overtaken vessel grounding or the subsequent improper maneuvering or navigation on the part of its crew. *Williams–McWilliams*, 286 F.Supp. at 642.

In a ruling seemingly contrary to *McWilliams*, another district court held the give-way vessel in an overtaking situation at fault because she approached so close to the stand-on vessel that she was unable to avoid a collision when the stand-on vessel executed a sudden change in course. *Liner v. Crewboat Mr. Lucky*, 275 F.Supp. 230, 234 (D.C.La.1967). Claimants argue that the Jablanica's crew similarly breached their navigational duties when the Jablanica approached so close to the Razal Brothers that a collision could not be avoided when the Razal Brothers turned into its path. I do not agree.

In *Crewboat Mr. Lucky*, it was weather conditions and clearly negligent behavior on the part of Mr. Lucky's crew that caused the duty to remain with the overtaking vessel. The overtaking vessel was proceeding in a heavy fog, at excessive speeds, with an inexperienced crew. Perhaps most egregious of all, it was attempting to overtake the stand-on vessel without any kind of signal. Citing these circumstances, the court held that the fact that the stand-on vessel turned sharply across the bow of the overtaking vessel could not exonerate the overtaking vessel from liability.

In the instant case, the collision took place in the middle of the day. The sky was clear and the lake was relatively calm. The crew of the Jablanica was made up of experienced seamen and Pilot Gumtow was familiar with the waters of Lake Michigan. Finally, there was no testimony that the Jablanica was traveling at an excessive speed as it approached the Razal Brothers and it is uncontroverted that ample signals were sounded to alert the crew of the Razal Brothers to the Jablanica's presence. Cf. *Bockenheim Unterweser v. M/V Voyager*, 495 F.Supp. 521, 524–25 (E.D.La. 1980) (passing vessel held partly at fault because it continued to overtake at excessive speeds despite a radio warning 12 to 13 minutes prior to collision of adverse river conditions at point of overtaking).

■ The collision between the Jablanica and the Razal Brothers more closely resembles that at issue in the *McWilliams* decision. In that case, it was inept navigating on the part of the crew of the stand-on vessel that was held to have been the cause of the collision. Similarly, I am convinced that it was poor navigational practices aboard the Razal Brothers that caused the collision with the Jablanica. I refer specifically to fishermen's violation of Rule 5, the related misuse of the automatic pilot equipment, and the Razal Brothers' resulting failure to stay on course.

Rule 5 states:

> Every vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

Rule 5 is one of the most basic rules of admiralty law, and failure to comply with it will rarely be excused. The fact that the day of the accident was clear and the lake calm does not excuse the Razal Brothers from compliance with Rule 5. 33 U.S.C. § 2004. Neither does the alleged custom among gill-net fishermen of dispensing with lookouts relieve the Razal Brothers of the legal duty to comply with Rule 5. *See Mylroie v. British Columbia Mills Tug & Barge Co.*, 268 Fed. 449 (9th Cir.1920), *affirmed*, 259 U.S. 1, 42 S.Ct. 430, 66 L.Ed. 807 (1922). Finally, the fact that the fishermen had placed their ship on automatic pilot does not relieve them of responsibility for failing to maintain a lookout. The treaties are replete with warnings against such a practice. The 56th Edition of Chapman's *Piloting, Seamanship, and Small Boat Handling* states:

> Using an automatic steering device is simple. It does much to relieve boredom and fatigue on long stretches, and can, under most circumstances, steer a straighter course than a human helmsman. The disadvantage in this equipment lies in its misuse: excessive reliance on the device and failure to keep a person at the helm as a lookout, ready to take over immediately if a dangerous situation develops. Remember, too, that the sensing element is usually no more "intelligent" than a magnetic compass; it is subject to all the same outside corrupting influences such as nearby tools, portable radios, and beer cans.

C. Chapman, *supra* at 551. *See also*, R. Farwell, *supra*. Clearly, use of automatic pilot equipment cannot replace a lookout. Not only is an automatic pilot mechanism incapable of appraising the situation as required by Rule 5, it is also susceptible to making grave navigational errors as a result of objects commonly found in and around ships, including other ships.

Failure to comply with Rule 5 will be excused only when the information that a lookout would have provided was already available to the navigational crew aboard the ship. *See, The Maria Martin*, 79 U.S. (12 Wall.) 31, 42, 20 L.Ed. 251 (1870); *U.S. v. Soya Atlantic*, 330 F.2d 732 (4th Cir. 1964). Such was not the situation in this case. Given the limited vision provided by the portholes in the deckhouse, it is obvious that a visual lookout stationed in the pilot house would have provided the crew of the Razal Brothers with critical information concerning the location of the Jablanica otherwise totally unobtainable from below. Similarly, a lookout located somewhere away from the uninsulated noise of the vessel's motor would have provided the Razal Brothers' crew with knowledge of the Jablanica's presence otherwise unobtainable from below deck. Had anyone on the Razal Brothers been keeping watch, either by sight or sound, the Jablanica's approach and intent to pass on the starboard side could not have been missed. As a consequence, upon observing the Jablanica, one of the crew members on the Razal Brothers would undoubtedly have disengaged the automatic pilot. Given the relatively calm seas, there can be little doubt that a crewman piloting the smaller vessel would have had no trouble maintaining the Razal Brothers' course and speed (as required by Rule 17) and consequently would not have collided with the Jablanica.

The Jablanica's alleged violation of Rules 7 and 34 do not affect my conclusion that

the sole proximate cause of the accident was the Razal Brothers' violations of rules 5 and 17.

██ While I am satisfied, by a preponderance of the evidence, that the crew of the Jablanica, as a technical matter, violated Rule 7 governing use of radar, I am also satisfied that its actions in no way contributed to the collision. Cases interpreting and applying the radar requirement are sparse, but as a Rule, liability for failure to use radar is only found when the navigational conditions are such that the radar plottings would have provided information otherwise unattainable by the crew. Thus, for instance, a ship approaching heavy fog is liable for a collision if it fails to use effectively its radar to detect another ship in its course. *See e.g., United States v. M/V Wuerttemberg*, 219 F.Supp. 211, 220 (E.D.S.C.1963), *aff'd* 330 F.2d 498, 503 (4th Cir.1964).

In the instant case, the Coast Guard Report, as well as the depositions of Captain Seman and Pilot Gumtow establish that the Jablanica was equipped with operating radar equipment. Furthermore, the captain stated that he sighted the Razal Brothers on radar when the smaller ship first came into view. While it is true that neither the pilot, the captain, nor the third mate used radar to plot the Razal Brothers' course, it is also undisputed that the day of the accident was clear and calm with visibility of approximately twenty miles. Further, there is ample testimony that Pilot Gumtow, Captain Seman, and the third mate each took careful note of the Razal Brothers from the time that it was first sighted some fifty minutes prior to the collision. All three periodically estimated its course and speed by "seaman's eye" and while a slightly more precise estimation of the Razal Brothers' course might have been obtained with radar plottings, such plottings would have provided essentially the same information as was obtained by sight. Certainly radar plottings could not have more accurately predicted the Razal Brothers' sharp unexpected starboard turn just prior to the collision. Thus, the failure to take

such plottings cannot be deemed to have contributed to the collision.

██ Although claimants cite Rule 34, they did not discuss what acts constituted the alleged violation under this Rule. I can see two possibilities. The first involves Pilot Gumtow's use of a long, rather than a short whistle, to indicate his intent to overtake on the starboard. The second involves the Jablanica's failure to take "appropriate precautionary action until a safe passing agreement was made."

With respect to the first, the evidence is uncontroverted that at 11:19 a.m., Pilot Gumtow sounded a single ten second blast on the Jablanica's whistle to advise that the Jablanica was overtaking the Razal Brothers on the starboard side. The pilot followed with six short blasts. Both the captain and the pilot characterized the first blast as a "long" whistle. Rule 34 establishes one short blast as the signal for overtaking on the starboard and Rule 32 defines a "short blast" as a blast of about one second's duration and "prolonged blast" as a blast of approximately four to six seconds duration. Thus, Pilot Gumtow's action was, in a technical sense, in violation of the Rule's mandate. However, I am satisfied that it was not a cause of the accident.

Though perhaps somewhat long in duration, the single whistle could not have been readily confused with a signal to pass on the port as a port passing signal consists of two blasts. Furthermore, according to the Coast Guard Report:

A long blast of 6–10 seconds (note defined in the Inland Rules) is commonly sounded by large vessels on the Great Lakes in order to comply with Rule 36 and to attract the attention of small vessels. The watch officer on the ship normally would use it to ensure that a small vessel (or vessels) in the immediate area was aware of the approaching ship. On some occasions, the ship's long blast may be followed by five or more short blasts to signify "doubt" or "danger" under Inland Rule 34(d).

*Coast Guard Report*, January 1987, at 17. Thus, while the Jablanica's passing signal may not have been the exact one required

by the navigational rules, the signals given were in keeping with customary practice on the Great Lakes. The Jablanica did not creep up silently on the Razal Brothers but followed the practice generally used to warn small ships of a large ship's approach.

In addressing the second possible claim, it must first be remembered that the duty for reaching a passing agreement does not rest solely with the overtaking vessel. Rule 34 provides that the overtaken vessel

shall, if in agreement, sound the same whistle signal and take the steps necessary to effect a safe passing. If, however, from any cause, the vessel doubts the safety of the proposed maneuver, she [the give-way vessel] shall sound the danger signal specified in paragraph (d) of this Rule and each vessel shall take appropriate precautionary action until a safe passing agreement is made.

In *The Mamei*, 152 F.2d 924, 929 (3rd Cir. 1945), *cert. denied sub. nom. Eastern Transportation Co. v. Walling*, 328 U.S. 836, 66 S.Ct. 981, 90 L.Ed. 1611 (1946) the Third Circuit held that a give-way vessel did not err in proceeding on its course when, after giving a signal to pass, the stand-on vessel did not respond. The court stated that it was *not* unreasonable for the captain of the give-way vessel to assume the stand-on vessel's silence constituted assent to the passing, particularly since the passing was proper and normal in light of the prevailing conditions.

With respect to the present suit, the Coast Guard Report states:

Ships' sound signals are seldom answered by small vessels. The small vessel usually responds to a signal by changing course or speed or both. These experiences are frequent in the more congested waterways of the Great Lakes, but they are not unknown even in open water.

*Coast Guard Report*, January 1987, at 17. In light of this practice, I am satisfied that it was not unreasonable for the pilot of the Jablanica, like the captain of the Mamei, to have taken the silence of the Razal Brothers as assent to the overtaking.

■ In another case cited in *The Mamei*, a give-way vessel was held liable because

on failure to obtain assent to a passing signal, it did not sound a danger signal. However, that case is distinguishable from the instant one. The captain of that vessel had noted the erratic course of the overtaken vessel from the moment he saw her and had frequently expressed his failure to understand her course of intention. *Mamei*, 152 F.2d at 929, citing *General Seafoods Corp. v. J.S. Packard Dredging Co.*, 120 F.2d 117, 119 (1st Cir.1941). The course of the Razal Brothers was not erratic and the captain and the pilot of the Jablanica, although well aware of the Razal Brothers' course, had no fear of a collision until the hard starboard turn which began only after the passing signal was sounded. Furthermore, when the Razal Brothers did begin to turn to starboard in apparent disregard of the Jablanica, Pilot Gumtow immediately sounded the danger signal and Captain Seman initiated avoidance maneuvers. Thus, I am satisfied that the Jablanica did not violate Rule 34.

Finally, I note that following trial, claimants cited *Federal Insurance Co. v. S.S. Royalton*, 312 F.2d 671 (6th Cir.1963) to the court. Although they did not specify the proposition which it allegedly supports, it seems to me that they may have been citing it for the argument that the Jablanica should have reversed her engines on failing to obtain a response to her passing signal. *Id.* at 674. I do not agree. The *Royalton* court based its decision on a Rule regarding navigation in fog. 33 U.S.C. § 272. That Rule was repealed in 1983. However, even assuming that the Rule retained some force and effect, the instant situation not only did *not* involve fog, but the parties both concede that visibility was nearly twenty miles. Thus, *Royalton* is not controlling.

### III. *Conclusion*

Although the "legal status" of the captain and the crewmen on board the Razal Brothers may have been different at the time of the accident, that fact is irrelevant and not discussed since I have concluded the sole proximate cause of the collision was the last minute, unexpected starboard turn of the Razal Brothers into the port bow of the Jablanica.

The death of these three men on Lake Michigan was, of course, a very tragic event. However, for experienced fishermen to place a commercial fishing boat on automatic pilot, head it into an area known to be trafficked by ocean going freighters as well as other fishing vessels, retire below deck in a windowless blind area to clean fish with no lookout above and remain completely oblivious of approaching vessels lawfully proceeding in well established shipping lanes constitutes willful, wanton misconduct. It is, in essence, this conduct which brought about the final, uncontrolled starboard turn of the Razal Brothers into the Jablanica which I conclude was the sole and proximate cause of this tragic and avoidable accident. Judgment of no cause for action shall be entered against Cathy S. King, Personal Representative of the Estate of Russell King, Deceased; Dorothy M. Perkins, Personal Representative of the Estate of Edward M. Perkins, Deceased; and Marlene K. Peterson, Personal Representative of the Estate of Kirk Peterson, Deceased, and in favor of Slobodna Plovidba, an agency of the Government of Yugoslavia, as owners of the M/V Jablanica. No costs are awarded.